**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

SALVATORE BADALAMENTI, ON BEHALF
OF HIMSELF AND THE PUTATIVE
CLASS,

    *Plaintiff*,

  v.

RESIDEO TECHNOLOGIES, INC.,
HONEYWELL INTERNATIONAL INC.,

    *Defendants*.

---

No. 22-cv-05592 (MEF)(CLW)


**OPINION and ORDER**


**Table of Contents**

I.      **Background**

        **A. Underwriters Laboratories**

        **B. The Allegations**

        **C. The Lawsuit**

        **D. The Motion**

        **E. The Court's Approach**

II.     **Legal Standards**

III.    **The Federal Claim**

IV.     **The State Claims**

        **A. The Misstatement Claims**

              **1.  New Jersey Cases Applying New Jersey Law**

              **2.  Federal Cases Applying New Jersey Law**

              **3.  Non-New Jersey Law**

              **4.  Policy**

          **5.  Conclusion**

     **B.  The Statutory Claims**

     **C.  The Remaining Claims**

**V.    Conclusion**

\*    \*    \*

A homeowner bought an alarm system, and came to believe it had a defect.

He sued the alarm manufacturers, pointing to alleged misrepresentations on the packaging the alarm came in.

The manufacturers now move to dismiss.

The motion is granted in part.

\*    \*    \*

**I.    Background**

  **A.    Underwriters Laboratories**

Underwriters Laboratories, Inc. ("UL") is a private entity.  <u>See</u> Shayna M. Sigman, <u>Kosher Without Law:  The Role of Nonlegal Sanctions in Overcoming Fraud Within the Kosher Food Industry</u>, 31 Fla. St. U. L. Rev. 509, 596 (2004).

It does two main things.  First, it issues safety standards. And second, it tests products to see if they measure up to the standards.  <u>See</u> Complaint ¶ 48; <u>see generally</u> Harry Brearly, "A Symbol of Safety: The Origins of Underwriters' Laboratories," <u>in Reputation: Studies in the Voluntary Elicitation of Good Conduct</u> 80-84 (Daniel B. Klein ed., 1997); Sigman, 31 Fla. St. U. L. Rev. at 596.

The law routinely relies on UL.  Per a federal regulation, for example, certain lighting fixtures can only be used if they clear the safety bar set by UL.  <u>See</u> 46 C.F.R. § 183.410(d). And another example: under a New Jersey regulation, particular

school bus parts must meet UL standards or they are a no-go. <u>See</u> N.J. Admin. Code § 13:20-53A.13.[1]

This case is mainly about UL standards.

**B.    <u>The Allegations</u>**

The allegations as relevant for now are as follows.

A homeowner bought a burglar/fire alarm ("the Alarm").  <u>See</u> Complaint ¶¶ 4, 16, 18.

The packaging said the Alarm was "UL Listed," <u>see</u> <u>id</u>. ¶ 21, and that it was "listed to" several UL standards, <u>see</u> <u>id</u>., Exhibit A, at 5.

But the homeowner concluded the Alarm did not in fact meet the UL standards, <u>see</u> <u>id</u>. ¶¶ 8, 63, and regretted the purchase --- because if the Alarm was not UL-compliant, he would not have bought it, <u>see</u> <u>id</u>. ¶ 15.

**C.    <u>The Lawsuit</u>**

In light of the above, the homeowner sued two companies that together manufactured the Alarm.  <u>See</u> <u>id</u>. ¶¶ 1-4.

From here, the homeowner is referred to as "the Plaintiff,"[2] and the manufacturers are, collectively, "the Defendants."[3]

The Plaintiff sued on behalf of a putative class of people who bought the Alarm.  <u>See</u> <u>id</u>. ¶ 74.

The Plaintiff's core theory: the Defendants are liable under one federal law and various state laws because the Alarm's packaging and some of its advertising said it was "UL listed," even though it did not actually meet underlying UL standards.  <u>See</u> <u>id</u>. ¶¶ 14-17, 80-141.

---

[1]  For some other examples, see 46 C.F.R. § 160.077-19(b) (personal flotation devices); 24 C.F.R. § 3280.703 (heating, cooling, and fuel burning appliances); N.J. Admin. Code § 14:8-5.3 (generator equipment).

[2]  Salvatore Badalamenti.

[3]  Honeywell International, Inc. and Resideo Technologies, Inc.

D.    **The Motion**

The Defendants have moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The motion is now before the Court.

E.    **The Court's Approach**

After a brief discussion of the general legal standards that are relevant here, see Part II, the Court's analysis is in four parts.

First, the Court takes up the Plaintiff's federal claim, see Part III, and concludes it must be dismissed, because there is no jurisdiction over it.

Second, the Court considers a cluster of state-law claims, see Part IV.A, each of which rests on the allegation that a false statement was made by the Defendants. These claims must be dismissed. No false statement was made.

Third, the Court assesses and dismisses two statutory claims, see Part IV.B, which arise under New Jersey law. These claims require a false statement or an omission. But here, there are no sufficient allegations of either.

Fourth and finally, see Part IV.C, the Court declines to rule for now on the remaining two state-law claims, to give the parties a chance to decide how they might want to proceed, including as to a legal issue noted last month by the Court.

## II.  **Legal Standards**

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008).

Motions to dismiss are assessed as follows.

First, the Court "must tak[e] note of the elements [a] plaintiff must plead to state a claim." Connelly v. Lane Constr. Corp., 809 F.3d 780, 787 (3d Cir. 2016) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).

<u>Second</u>, the Court must identify those allegations in the complaint that are merely conclusory, and set them to one side as irrelevant to the analysis.  <u>See</u> <u>id</u>.

And <u>third</u>, the Court must determine whether the remaining allegations "plausibly give rise to an entitlement to relief." <u>Id</u>. at 787 (quoting <u>Iqbal</u>, 556 U.S. at 679).

### III.  <u>The Federal Claim</u>

The Plaintiff presses one federal claim, under the Magnuson-Moss Warranty Act.  <u>See</u> Complaint ¶¶ 118-27.

A Warranty Act claim can go forward as a class action, as the Plaintiff proposes here, <u>see id</u>. ¶ 119, only if there are 100 or more named plaintiffs.  <u>See</u> 15 U.S.C. § 2310(d)(3)(c).

But that box is not checked.  Here, there is only one named plaintiff.  <u>See</u> Complaint at 1.

Therefore, the Warranty Act claim must be dismissed.  <u>See</u> <u>Rowland</u> v. <u>Bissell Homecare, Inc.</u>, 73 F.4th 177, 182 (3d Cir. 2023) (no jurisdiction under the Warranty Act over any of four putative class actions, each of which had one named plaintiff).[4]

### IV.  <u>The State Claims</u>

The Plaintiff's remaining seven claims are state-law claims. <u>See</u> Complaint ¶¶ 80-117, 128-41.[5]

---

[4]  The Plaintiff does not suggest the Court can exercise supplemental jurisdiction over the Warranty Act claim based on its jurisdiction over the <u>other</u> claims in the case.  <u>See</u> <u>generally</u> 28 U.S.C. § 1367.  An argument along those lines may have faced an uphill climb.  <u>Cf</u>. <u>Paolucci</u> v. <u>FCA US LLC</u>, 2024 WL 3355390, at *4 (D.N.J. July 9, 2024) (discussing supplemental jurisdiction over Warranty Act claims).  But one way or another, it is for the parties to choose the arguments they want to make, <u>see</u> <u>Wu</u> v. <u>GSX Techedu Inc.</u>, --- F. Supp. 3d ---, ---, 2024 WL 3163219, at *25 (D.N.J. June 25, 2024), and no supplemental jurisdiction argument is pressed here.  The Plaintiff has the burden of establishing jurisdiction.  <u>See</u> <u>Boyer</u> v. <u>Snap-on Tools Corp.</u>, 913 F.2d 108, 111 (3d Cir. 1990).  He cannot carry that burden based on an argument he does not make.

[5]  As to some of the claims, the Complaint does not say which state's law is in play.  <u>See</u> Complaint ¶¶ 91-117, 128-34.  But

Of these seven claims, consider three in Part IV.A, two in Part IV.B, and the remaining two in Part IV.C.

**A.    The Misstatement Claims**

Start with the claims for common law fraud, negligent misrepresentation, and breach of express warranty.  <u>See</u> Complaint ¶¶ 91-110.

These claims are different, one from the next.[6]

But they share this in common: an element of each claim is that a false statement was made.  <u>See</u> <u>Gennari</u>, 148 N.J. at 610 (common law fraud: "a material misrepresentation"); <u>Kaufman</u>, 165 N.J. at 109 (negligent misrepresentation: "an incorrect statement") (cleaned up); <u>Gladden</u>, 83 N.J. at 325 (express warranty breached by "[a]ny [false] affirmation of fact or promise made by the seller to the buyer which relates to the goods").

The Defendants argue that the three claims cannot go forward, each for the same reason.  Namely: the Plaintiff has not pleaded a false statement.  <u>See</u> Motion to Dismiss at 12-16.

This argument is persuasive.

To see why, zero in on the main false statement identified by the Plaintiff --- that the Alarm's packaging states it was "UL

---

the parties' briefs assume throughout that New Jersey law applies.  <u>See</u>, <u>e.g.</u>, Motion to Dismiss at 36-37; Opposition Brief at 26-32, 36-38; Reply at 15.  And "[w]here parties' briefs assume that a particular forum's law controls, such implied consent . . . is sufficient to establish choice of law." <u>Navigators Specialty Ins. Co.</u> v. <u>Citizens Ins. Co. of Am.</u>, --- F. Supp. 3d ---, ---, 2024 WL 3287848, at *2 (D.N.J. July 3, 2024) (collecting cases).  Therefore, the Court takes the state-law claims here as arising under New Jersey law.

[6]  For the elements of common law fraud, look to <u>Gennari</u> v. <u>Weichert Co. Realtors</u>, 148 N.J. 582, 610 (1997); for negligent misrepresentation, <u>Kaufman</u> v. <u>i-Stat Corp.</u>, 165 N.J. 94, 109 (2000); and for breach of express warranty, <u>Gladden</u> v. <u>Cadillac Motor Car Div., Gen. Motors Corp.</u>, 83 N.J. 320, 325 (1980), and <u>Snyder</u> v. <u>Farnam Cos., Inc.</u>, 792 F. Supp. 2d 712, 721 (D.N.J. 2011).

listed," see Opposition Brief at 3 (citing Complaint ¶ 20-21), and that some of the Defendants' advertising made the same point. See Complaint ¶ 100.[7]

By saying the Alarm was "UL listed," the Plaintiff's argument goes, the packaging not only promised that the Alarm was UL listed[8] --- it also promised that the Alarm met the substantive requirements of the underlying UL standards. See Opposition Brief at 3; Complaint ¶ 23. Per the Plaintiff, this was a false promise because the Alarm did not in fact conform to UL standards. See Complaint ¶¶ 4, 58.

Does this argument work? The answer is not a quick yes or no.

New Jersey law is controlling here, see footnote 5, and as to New Jersey law "the decisions of the [New Jersey] Supreme Court are the authoritative source." Spence v. ESAB Grp., Inc., 623 F.3d 212, 216 (3d Cir. 2010).

But the New Jersey Supreme Court has not ruled on the key question here.

That question is whether a company makes a false statement for the purpose of state tort law when it (truthfully) says that its product has been certified by a third-party entity --- but the product, it is alleged, does not in fact meet the certifier's underlying standards. See Dzielak v. Whirlpool Corp., 83 F.4th 244, 263 (3d Cir. 2023) (noting this is an open question).

Without an on-point ruling to go on, "this Court must predict how the [New Jersey] Supreme Court would answer th[is] question, and proceed in light of the prediction." Howard v. Wells Fargo Bank, N.A., --- F. Supp. 3d ---, ---, 2024 WL 2044622, at *2 (D.N.J. May 8, 2024).

The Court's prediction is in four steps.[9]

---

[7] Note that "UL listed" cannot be chalked up as a false statement in any strictly literal way. After all, the Alarm was UL listed. See Complaint ¶¶ 20, 49 (alleging that it was); see also id., Exhibit F, at 25 (expert report explaining that the Alarm was "UL listed").

[8] It was. See footnote 7.

[9] The Court's method here is to treat the false statement element as requiring essentially the same thing across the board

### 1.    New Jersey Cases Applying New Jersey Law

To make predictions as to how a state supreme court will rule, the stepping-off point is usually a look at how lower state courts have thought through the relevant issue.  See Gov't Emps. Ins. Co. v. Mount Prospect Chiropractic Ctr., P.A., 98 F.4th 463, 468-69 (3d Cir. 2024); see also Navigators, 2024 WL 3287848, at *5; Schulman v. Zoetis, Inc., 684 F. Supp. 3d 275, 278 (D.N.J. 2023); Howard, 2024 WL 2044622, at *3; Pinkston v. City of Jersey City, 699 F. Supp. 3d 298, 304 (D.N.J. 2023).

But here, that does not advance the ball.  The parties point to no New Jersey lower court decisions on the relevant question.  And the Court has not turned up any, either.

### 2.    Federal Cases Applying New Jersey Law

A second look-out point from which to predict how a state supreme court will rule: federal court decisions that reach and resolve the open state law question.  See Spence, 623 F.3d at 216; Howard, 2024 WL 2044622, at *3.

But same problem.  The parties point to no federal court opinions that take on the relevant question of New Jersey law.  And again, the Court has not found any.

### 3.    Non-New Jersey Law

A third basis for prediction: a look to the laws of other states, and how they address the question in play.  See Howard, 2024 WL 2044622, at *3; Navigators, 2024 WL 3287848, at *6.

---

--- regardless of whether that element is baked into a claim for common law fraud, negligent misrepresentation, or breach of express warranty.  Courts applying New Jersey law routinely take this approach.  See, e.g., Union Ink Co., Inc. v. AT&T Corp., 352 N.J. Super. 617, 645 (App. Div. 2002); New Hope Pipe Liners, LLC v. Composites One, LCC, 2009 WL 4282644, at *5 (D.N.J. Nov. 30, 2009); Hemy v. Perdue Farms, Inc., 2011 WL 6002463, at *21 (D.N.J. Nov. 30, 2011); Peruto v. TimberTech Ltd., 126 F. Supp. 3d 447, 453-59 (D.N.J. 2015); cf. Pai v. DRX Urgent Care, LLC, 2014 WL 837158, at *12 (D.N.J. Mar. 4, 2014); Hurdleston v. New Century Fin. Servs., 629 F. Supp. 2d 434, 443-44 (D.N.J. 2009).

This provides a way forward.

Take, for example, <u>Board-Tech Electronic Co., Ltd.</u> v. <u>Eaton Electric Holdings LLC</u>, 2017 WL 4990659, at *1-*3 (S.D.N.Y. Oct. 31, 2017), <u>aff'd sub nom.</u> <u>Bd.-Tech Elec. Co.</u> v. <u>Eaton Corp.</u>, 737 F. App'x 556 (2d Cir. 2018).

In that case, the plaintiff sued a light-switch manufacturer, pressing claims under the laws of four states.  <u>See id</u>. at *1-*3.  The claims there were similar to the claims here.  The manufacturer said its product was UL "listed," <u>see</u> id. at *2, and indeed it was.  <u>See id</u>.  But the plaintiff argued this counted as a false statement --- because the light switches did not measure up to UL's underlying requirements.  <u>See id</u>.

The court dismissed the plaintiff's claims, holding they were not viable under the laws of New York, California, Illinois, or Texas.  <u>See id</u>. at *3, *7.  Why?  "UL listed" meant that the product was certified by UL --- not that it met UL's certification standards.  <u>See id</u>. at *7.

Look to another example.

In <u>Warren Technology, Inc.</u> v. <u>UL LLC</u>, 962 F.3d 1324 (11th Cir. 2020), a manufacturer sued a competitor, alleging the competitor misrepresented its product by saying it was UL listed.  <u>See id</u>. at 1326-27.  The product in question was certified by UL.  <u>See id</u>. at 1326.  Florida law controlled.  <u>See id</u>.  Same theory ("UL listed" means compliant with underlying UL standards, <u>see id</u>. at 1329) and same result (case dismissed, for lack of a misrepresentation, <u>see id</u>.).

Other UL cases can be multiplied, each to the same effect.  <u>See</u>, e.g., <u>Koski</u> v. <u>Carrier Corp.</u>, 347 F. Supp. 3d 1185 (2017) (the plaintiffs claimed the manufacturers falsely stated that their products were UL certified, because the "products [did] not in fact comply with the [underlying] safety standards," <u>id</u>. at 1193-95; but the products were UL certified, and so the claims were dismissed under Florida law, <u>see id</u>. at 1189-90).

And the UL cases are not outliers.  Courts have applied the same principles sketched out above to questions involving third-party

certifiers other than UL.  See Haynes v. Yale-New Haven Hosp., 243 Conn. 17, 39 (1997) (no misrepresentation under Connecticut law where a hospital, certified as a major trauma center, held itself out as certified --- even though the plaintiffs alleged it did not actually meet the required standards); see also Express Gold Cash, Inc. v. Beyond 79, LLC, 2019 WL 4394567, at *6-*7 (W.D.N.Y. Sept. 13, 2019) (no misrepresentation under New York law where defendant truthfully said it had been "ranked #1" by a TV show --- even though, it was claimed, the defendant did not in fact meet the show's standards).

In short: applying the laws of California, Connecticut, Florida, Illinois, New York, and Texas, courts have held when a company says its product or service is certified by a third-party, a plaintiff cannot claim that the company made a false statement solely by alleging that the certifier should not have made the certification in the first place.[10]

This moves the needle for two reasons.

First, "how other jurisdictions answer a legal question can provide a basis for predicting how a[] [state supreme court] will answer the [same] question." Navigators, 2024 WL 3287848, at *7; accord, e.g., Howard, 2024 WL 2044622, at *4; Smith v. CitiMortgage, Inc., 702 F. Supp. 3d 247, 256 (D.N.J. 2023).

And second, when predicting how a state supreme court will rule, a federal court should use the same interpretive methodology "that the state supreme court applies in the relevant area of law." Navigators, 2024 WL 3287848, at *7; see also, e.g., G.E.M.S. Partners LLC v. AmGUARD Ins. Co., --- F. Supp. 3d ---, ---, 2024 WL 3568932, at *2 (D.N.J. July 29, 2024).

When it decides questions of product liability and common-law fraud, of the kind at issue here, the New Jersey Supreme Court has affirmatively looked to cases applying other states' laws as a basis for itself setting the contours of New Jersey law.  See, e.g., Whelan v. Armstrong Int'l Inc., 242 N.J. 311, 340 (2020); In re Reglan Litig., 226 N.J. 315, 339 (2016); Weinberg v. Sprint Corp., 173 N.J. 233, 245 (2002); Kaufman, 165 N.J. at

---

[10]    There do not appear to be any cases that go the other way.

113; <u>Alloway</u> v. <u>Gen. Marine Indus., L.P.</u>, 149 N.J. 620, 633 (1997); <u>cf</u>. <u>Banco Popular N. Am.</u> v. <u>Gandi</u>, 184 N.J. 161, 175 (2005).

And the Supreme Court has been especially committed to affirmatively looking to out-of-state decisions when, as here, the relevant issues are novel in New Jersey. <u>See</u>, <u>e.g.</u>, <u>Petro-Lubricant Testing Lab'ys, Inc.</u> v. <u>Adelman</u>, 233 N.J. 236, 252 (2018) ("For this Court . . . [the issue] is a matter of first impression. We therefore look to other courts for guidance."); <u>State</u> v. <u>Stott</u>, 171 N.J. 343, 355 (2002) ("Because that is a question of first impression, we must consider analogous concepts in our prior case law and in other jurisdictions.").[11]

Bottom line: the decisions of courts in other jurisdictions loom especially large here,[12] and they point in the same direction --- a company's statement that its product is third-party certified implies that the product is indeed so certified, but purports to say nothing about whether the third-party made the right

---

[11]  The two reasons discussed in the text for relying on out-of-jurisdiction decisions as a basis for prediction are a bit different from each other. The <u>first</u> reason is a matter of probability. If the majority of courts have thought through a particular legal problem and resolved it in the same way --- then that provides some basis for predicting that the next court will see things in the same way, too. This is mainly because American courts are working within a legal system that, to an extent, shares basic premises and approaches, even across state lines. The <u>second</u> reason is dynamic. If a state supreme court, as here, affirmatively chooses to give weight to other jurisdictions' rulings, then those out-of-jurisdiction rulings exert their own, independent gravitational pull on the state supreme court's decision-making. In that circumstance, the earlier decisions of Courts 1, 2, 3 and 4 are not only passive data points that suggest how the state supreme court might rule --- they also actively pull the supreme court in the same direction as Courts 1 through 4.

[12]  Why "especially" large? Because of the two reasons described in the text and in footnote 11, the first reason (the probabilistic one) is virtually always in play. And in this case --- the second reason is <u>also</u> in play, because of the added, affirmative weight that the New Jersey Supreme Court has chosen to give out-of-jurisdiction decisions in this area.

decision in issuing its certification.  This means that if the third-party allegedly got it wrong, then the company cannot, without more, be sued for a false statement solely on that basis.

### 4.  **Policy**

A final basis for the Court's prediction is set out here.

> To accurately predict how a state supreme court will rule on an open legal question, a federal court should generally analyze the question using the same interpretive approach that the state supreme court applies in the relevant area of the law. See Pinkston, --- F.Supp.3d at ----, 2023 WL 6888265, at *6; Schulman, 684 F. Supp. 3d at 279-281, 281 n.5 (collecting cases); Abbe R. Gluck, Intersystemic Statutory Interpretation: Methodology As "Law" and the Erie Doctrine, 120 Yale L.J. 1898, 1929-30 (2011).  After all, the state court will itself apply that interpretive approach to eventually generate its decision. And by taking that approach now, the federal court increases the likelihood that it will get its prediction right.
>
> . . .
>
> Take as an[] example a case that turns on this open question: will the state supreme court extend the scope of statutory immunity?  The federal court will do a better job of predicting state law if it tackles the open question using the same interpretive approach (textual analysis? policy-focused analysis?) that the state supreme court will itself use. The reason: the state supreme court's chosen interpretive approach may well inform its ultimate decision.  And because the road the state supreme court opts to take can influence the destination it will reach, the federal court --- aiming to get to that same destination --- should set off at the outset down the same road.  See generally Pinkston, --- F.Supp.3d at ----, 2023 WL 6888265, at *6 (discussing the immunity example).

Navigators, 2024 WL 3287848, at *7.

One of the core methodologies of the New Jersey Supreme Court when it comes to product liability cases such as this one is to fold public policy concerns into the mix.  See, e.g., Zaza v. Marquess & Nell, Inc., 144 N.J. 34, 64 (1996) ("Products

liability law is a matter of public policy."); see also Fowler v. Akzo Nobel Chems., Inc., 251 N.J. 300, 307 (2022); Feldman v. Lederle Lab'ys, 97 N.J. 429, 441-42 (1984); Brown v. U.S. Stove Co., 98 N.J. 155, 173-74 (1984); cf. Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 435 (1993); Carr v. Carr, 120 N.J. 336, 350 (1990).

Accordingly, this Court is bound to go down the same track, in order to predict how the New Jersey Supreme Court would resolve the relevant open question. See Navigators, 2024 WL 3287848, at *7; cf. Pinkston, 699 F. Supp. 3d at 305.

To see one of the key policy concerns at issue here, note that the need for UL certification is marbled through New Jersey's regulatory scheme. Numerous state safety regulations require products to be UL listed. See, e.g., N.J. Admin. Code § 5:70-4.19 (smoke alarms and carbon monoxide alarms installed in certain dwellings); id. § 8:43-15.3 (portable electrical appliances in licensed residential healthcare facilities); id. § 13:20-53A.15 (certain parts in school buses); id. § 8:41-3.19 (fire extinguishers in mobile intensive care units); id. § 7:14B-4.1 (underground storage tank systems); id. § 5:10-14.5 (electric and gas space heaters installed in hotels and multiple dwellings).

There may be any number of reasons for New Jersey to rely on UL in this way.

But one is not hard to see: UL is "an independent entity." Bd.-Tech, 737 Fed. App'x at 558. It aims to operate on its own, separate from the manufacturers whose products it certifies. See generally, e.g., Milanowicz v. Raymond Corp., 148 F. Supp. 2d 525, 533 (D.N.J. 2001) (describing UL as an "independent standards organization[]"); Brearly at 82 (describing the "impersonal" nature of UL's work, and also a particular effort to undermine its independence).

UL's independence is also reflected in federal law.

For example, UL is a Nationally Recognized Testing Laboratory, see Complaint ¶ 8; Warren Tech., 962 F.3d at 1326, and under federal law such laboratories must be "completely independent of . . . any manufacturers or vendors of equipment or materials being tested[.]" 29 C.F.R. § 1910.7(b)(3).

And another example. UL has a registered "certification mark" under the Lanham Act. See Trademark Search, U.S. Patent &

Trademark Off., https://tmsearch.uspto.gov/search/search-information (search in search bar for "UL listed") (last visited Nov. 2, 2024).[13]  And a "certification mark" registrant, such as UL, must meet certain standards of independence.  See id. § 1064(5).

In short: UL aims for independence --- and is indeed required to meet federal-law standards of independence.

In turn, UL's independence (or at least its aspiration to independence) is plainly fundamental to why New Jersey relies on it.

The bigger picture makes that clear.

When publicly-employed regulators are the ones to set standards and to test for compliance, their independence is ensured by various laws.[14]

---

[13]  A "certification mark" allows other entities to use the mark (as the Alarm manufacturers did here) "to certify . . . goods," 15 U.S.C. § 1127 (here, the Alarm).

[14]  See, e.g., N.J. Stat. Ann. § 52:13D-21(a) (housing State Ethics Commission in the Department of Law and Public Safety, but noting it "shall be independent of any supervision and control by the department"); id. § 11A:2-1 (placing Civil Service Commission in the Department of Labor and Workforce Development but "independent of any supervision or control by the department"); see also id. § 52:13D-16 ("No special State officer or employee" may represent a "party other than the State in connection with any cause, proceeding, application or other matter pending before the particular office" where the individual is employed); id. § 52:13D-19 (apart from certain exceptions, "[n]o . . . State officer or employee shall" "undertake or execute, in whole or in part, any contract, agreement, sale or purchase of the value of $25.00 or more," with any state agency); id. § 52:13D-17 (barring former state officers or employees from representing entities in any matter in which the former employee "made any investigation, rendered any ruling, given any opinion, or been otherwise substantially and directly involved"); id. § 5:12-59 (members of the New Jersey Casino Control Commission may not gamble in any establishment licensed by the Commission and may not solicit or accept employment from entities licensed by the Commission for a period of four years after they end their service); id. § 2C:27-2 (criminalizing bribery of public servants and party officials).

14

And when standard-setting and compliance-testing are done for New Jersey by <u>private</u> entities --- independence is, again, the law's expectation.  For example, for New Jersey businesses that must undergo "an annual audit by independent certified public accountants," N.J. Admin. Code § 11:2-26.1, "independen[ce]," is carefully defined.  <u>Id</u>. § 11:2-26.6(h).  And another example: to get up and running, certain surgery facilities must submit a "survey of the facility performed by an independent accreditation organization[.]"  <u>Id</u>. § 8:43A-3.12(b).

In a nutshell: UL aims for independence from the entities whose products it certifies, and that sort of independence is plainly important to New Jersey as a policy matter.  It is apparently part of why the state looks to UL to perform standard-setting and compliance tasks that would otherwise be the tasks of state officials (who must also be independent).

But UL's independence would be eroded to an extent if the law were as the Plaintiff suggests.

Recall that on the Plaintiff's proposed rule, manufacturers can be liable for noting their products are UL-certified if UL allegedly should not have issued a certification in the first place.  On this approach, UL error (certifying a product when it should not have) becomes a possible basis for liability on the part of the product manufacturer.

But when one party becomes financially responsible for another, as the Plaintiff argues for here, the knock-on effects are predictable.

For example, if an insurance company is considering a contract that would require it to make a payout if an insured dies this year or next, the insurer will often seek to gain more information before going forward --- its personnel might conduct interviews about the prospective insured's family medical history, or take vital signs and blood samples.

Another example: a person might agree to stand behind someone else's debt, but rarely does she do so without first taking a hard look at the debtor's bank statement.

One more example: a parent who guarantees his child's lease may well want to know who the possible subletters are --- and can be expected to think about vetoing subletters who seem like they could cause damage.

15

And the dynamic is the same when it is tort law, not a contractual agreement, that makes one party responsible for another.

If a building owner might be answerable in tort when an apartment catches fire --- then no one will be surprised if the owner makes it his business to limit what the apartment can be used for, or to mandate the installation of in-apartment smoke detectors.

In a state that has a dram-shop law, a bartender can be liable for the damage caused by a drunk person the bartender nonetheless opts to serve.  If such a law is in place, the bartender can be expected to take note.  She will have stronger reason to seek out information (how many have you had?) and to take action (I'm cutting you off).  Indeed, incentivizing this sort of behavior from the bartender is part of why dram-shop laws are on the books in the first place.

The fundamental point: when Party 1 becomes potentially liable for the conduct of Party 2, through contract or through tort, powerful incentives are created --- for Party 1 to protect itself from possible future financial consequences by working to learn more about what Party 2 is up to, and, where necessary, to think about how it can adjust Party 2's conduct.

The implication of all this: if, as the Plaintiff contends, manufacturers are potentially liable for erroneous certification decisions made by UL, then manufacturers will have strong financial reasons to get under the hood --- to demand a closer understanding of precisely how UL is making the decisions it does, and to expect changes from UL if UL is not, in the manufacturers' judgment, measuring up.

But all of this would tend to erode UL's independence from manufacturers.  And, as noted, that independence appears critical to New Jersey.  It is at the core of why the state has opted, as a policy matter, to rely on UL and other certifying agencies when it comes to public safety standards.

In short: the Plaintiff's proposed rule is at odds, at least to an extent, with a key New Jersey policy choice --- the choice to keep independent certifiers independent.

And that supplies an added reason to predict that the New Jersey Supreme Court is unlikely to go the Plaintiff's way.

16

To see the point from a slightly different angle, note that the basic starting point of New Jersey tort law is liability for one's own conduct, not for another's.  As the New Jersey Supreme Court has put it: "as a general rule of tort law, liability must be based on personal fault."  Carter v. Reynolds, 175 N.J. 402, 408 (2003); accord, e.g., Podias v. Mairs, 394 N.J. Super. 338, 346 (App. Div. 2007); Dan B. Dobbs, Paul T. Hayden, & Ellen M. Bublick, The Law of Torts § 425 (2d ed. 2011) (describing "the usual rule that each person is accountable for his own legal fault but in the absence of such fault is not responsible for the actions of others").

This "general rule" has exceptions.   The most prominent one: a principal is sometimes liable for an agent's conduct.  See Baldasarre v. Butler, 132 N.J. 278, 289 (1993); see also Wright v. State, 169 N.J. 422, 435-36 (2001).  An agent is dependent on the principal.  See Sears Mortg. Corp. v. Rose, 134 N.J. 326, 337 (1993) ("An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent."); see also Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006) ("Agency . . . arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control[.]").  And under New Jersey law, that dependent relationship is a good part of why principals are responsible for agents --- and why people who hire independent contractors are not generally liable for them.  See, e.g., Jarrell v. Kaul, 223 N.J. 294, 316 (2015); Galvao v. G.R. Robert Constr. Co., 179 N.J. 462, 467, 471-73 (2004); Muhammad v. N.J. Transit, 176 N.J. 185, 196-97 (2003); Baldasarre, 132 N.J. at 292-93; Majestic Realty Assocs., Inc. v. Toti Contracting Co., 30 N.J. 425, 430-31 (1959); Courtinard v. Gray Burial & Cremation Co., 98 N.J.L. 493, 496 (1923).

But the rule proposed here by the Plaintiff would be in some tension with all of this.

It would depart from New Jersey law's baseline starting point, of tort "liability . . . based on personal fault," not someone else's.  Carter, 175 N.J. at 408.

And it would move away from New Jersey's legal baseline in a surprising direction --- 180 degrees away from where New Jersey law generally goes.  Under the Plaintiff's proposed rule, a manufacturer could be financially liable for the alleged error of a certifying entity (UL) that is not <u>dependent</u> on it --- but rather for the alleged error of a certifying entity that aims to be <u>independent</u> of it, and is indeed required to be independent of it as a matter of federal law.[15]

### 5.  <u>Conclusion</u>

The Court predicts that the New Jersey Supreme Court would rule that a company's statement that its product is third-party certified does not, without more, allow the company to be sued on a tort claim that rests on a false statement when the alleged false statement is that the third-party made the wrong decision in issuing its certification.

This prediction is consistent with the views taken by courts around the country.  <u>See</u> Part III.A.3.

And this prediction is consistent with what appears to be New Jersey's policy preferences.  <u>See</u> Part III.A.4.[16]

---

[15]  Two points here.  <u>First</u>, the text describes dissonance between (a) New Jersey's policy preference (independence for UL) and (b) the likely impact of the Plaintiff's proposed rule (less independence for UL).  When it comes to predicting the content of New Jersey law, this dissonance puts a thumb on the scale against the Plaintiff's proposed rule.  But the Court does not take any view as to whether the predicted rule is optimal, as a policy matter or otherwise.  That is not the Court's role here. <u>Cf</u>. <u>Pinkston</u>, 699 F. Supp. 3d at 305 (making a similar point). A <u>second</u> point.  New Jersey is committed as a policy matter to ensuring that people who are injured have remedies.  <u>See</u> <u>Bombace</u> v. <u>City of Newark</u>, 125 N.J. 361, 373 (1991); <u>Patusco</u> v. <u>Prince Macaroni, Inc.</u>, 50 N.J. 365, 368 (1967).  But the prediction here about New Jersey law would not leave consumers without redress.  For example, direct remedies can be sought from manufacturers on a product defects theory.  <u>See</u>, <u>e.g.</u>, <u>Gremo</u> v. <u>Bayer Corp.</u>, 469 F. Supp. 3d 240, 247 (D.N.J. 2020); <u>Kemly</u> v. <u>Werner Co.</u>, 151 F. Supp. 3d 496, 501, 508 (D.N.J. 2015).
[16]  The Court's prediction as to New Jersey law runs only as far as it must.  It does not purport to cover factual situations that are different than the one in play in this case.  To see

In light of this prediction, the Plaintiff's negligent misrepresentation, common law fraud, and express warranty claims must be dismissed. Each claim is based on the Defendants' statement that the Alarm was "UL listed" --- and the assertion that that statement is false because UL should not have

---

the point, take two examples. <u>First</u>, the Court might potentially make a different legal prediction if there was improper collusion between UL and a manufacturer, or if the manufacturer worked to actively deceive UL to procure a certification. <u>Cf.</u>, <u>e.g.</u>, <u>Burndy Corp.</u> v. <u>Teledyne Indus., Inc.</u>, 584 F. Supp. 656, 659-62 (D. Conn. 1984), <u>aff'd</u>, 748 F.2d 767 (2d Cir. 1984). But that scenario is not on the table here. The reason: the closest the Plaintiff comes to alleging impropriety is the allegation that "the Defendants knew or were required to know that its product was non-conforming before it submitted its equipment to UL." Complaint ¶ 49. But this is little more than a restatement of the knowledge element of a common-law fraud claim. And legal conclusions "done up" as factual allegations must be put aside. <u>See</u> <u>Hacker</u> v. <u>Elec. Last Mile Sols., Inc.</u>, 687 F. Supp. 3d 582, 601 (D.N.J. 2023); <u>Rajpurohit</u> v. <u>Becton, Dickinson, & Co.</u>, 2024 WL 1477652, at *7 n.15 (D.N.J. Apr. 5, 2024). The Plaintiff's should-have-known allegation would plainly be too generic to survive. <u>See</u> <u>Gotthelf</u> v. <u>Toyota Motor Sales, U.S.A., Inc.</u>, 525 F. App'x 94, 104 (3d Cir. 2013); <u>Snowdy</u> v. <u>Mercedes-Benz USA, LLC</u>, 2024 WL 1366446, at *20 (D.N.J. April 1, 2024). <u>Second</u>, the Court might potentially make a different legal prediction if the manufacturer did not believe that its product met the relevant UL standards --- but opted to submit the product anyway, in the hopes of a mistake squeaking through, and a false-positive certification being obtained from UL. After all, it might be argued, submission of a product to a third-party certifier by a manufacturer is an implicit representation from the manufacturer that the product <u>should</u> be certified --- and that implicit representation is understood by the consumer, who later sees the UL mark. <u>Cf.</u> <u>In re Celgene Corp., Inc. Sec. Litig.</u>, --- F. Supp. 3d ---, ---, 2024 WL 4047674, at *21 n.34 (D.N.J. Sept. 4, 2024) (discussing submission of an application to a government regulator). But same point as above. There are no specific-enough allegations here as to the manufacturer's knowledge that would render this a relevant legal question in this case.

certified the Alarm.  But that does not state a claim under New Jersey law, as predicted by this Court.[17]

**B.**  **The Statutory Claims**

Turn now to two related claims that arise under New Jersey statutes.

First, the Plaintiff claims the Defendants have violated the New Jersey Consumer Fraud Act.  See Complaint ¶¶ 80-90.

The elements of a Consumer Fraud Act claim: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the

---

[17]  The Plaintiff also hones in on other allegedly false statements about a fire protection association.  See Complaint ¶¶ 20-23; id., Exhibit A.  But this approach fails for largely the same reasons that the "UL listed" statements do.  And one added argument bears note here.  The packaging on the Alarm, this argument goes, said it complied with a particular fire protection standard ("NFPA 72"), but it did not.  See Opposition Brief at 2-4 (citing Complaint ¶ 25).  But the packaging did not say the Alarm met NFPA 72.  Rather, it told Alarm buyers to install and place the Alarms in keeping with that standard.  See Complaint ¶ 21; id., Exhibit A at 2.  A direction to a person about how an Alarm should be installed says nothing that is relevant here about the quality of the Alarm.  See, e.g., Volin v. Gen. Elec. Co., 189 F. Supp. 3d 411, 420-21 (D.N.J. 2016) (instructions regarding product use did not constitute an affirmation that the product met a certain standard).  This is a familiar distinction, between backward-looking statements that can be true or false, and forward-looking directives, which generally cannot be.  One place this distinction comes up is in the law of evidence --- where courts routinely observe that commands are not typically hearsay, because they do not say anything that purports to be true.  See, e.g., United States v. Ned, 637 F.3d 562, 569 (5th Cir. 2011); United States v. White, 639 F.3d 331, 337 (7th Cir. 2011).  The intuition: "you did this" is a description of something; "do this," a command, does not describe anything.  Because they are not trying to describe something, commands cannot generally be contradicted --- and therefore cannot be chalked up as false.  As a result, they cannot be used as a basis for a claim that must be based on a false statement.

ascertainable loss." <u>Bosland</u> v. <u>Warnock Dodge, Inc.</u>, 197 N.J. 543, 557 (2009).

As to the first element, focused on unlawful conduct, the CFA speaks of:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact . . .

N.J.S.A. § 56:8-2.

But any allegations here as to "misrepresentation[s]," do not pass muster, for reasons that have been discussed. <u>See</u> Part IV.A.

And the allegations here as to "omission[s]" are entirely conclusory. <u>See</u> footnote 16. Knew or should have known is not enough. <u>See</u> <u>id</u>.

The Consumer Fraud Act claim is therefore dismissed.[18]

This also disposes of the Plaintiff's other statutory claim, under the Truth in Consumer Contract, Warranty, and Notice Act ("TCCWNA"). <u>See</u> Complaint ¶¶ 135-41.

"The TCCWNA does not establish consumer rights or seller responsibilities. . . . The rights and responsibilities to be

---

[18] The Consumer Fraud Act can sometimes allow for regulatory violations to count as an unlawful practice. <u>See</u> <u>generally</u> <u>Cox</u> v. <u>Sears Roebuck & Co.</u>, 138 N.J. 2, 17 (1994); <u>Frederico</u> v. <u>Home Depot</u>, 507 F.3d 188, 202 (3d Cir. 2007). The Plaintiff's brief alludes in places to alleged construction code violations. <u>See</u> Opposition Brief at 2-3, 8; <u>see also</u> Complaint ¶ 9, 15, 90. But this is a here-and-there smattering. These references are not developed into an argument, let alone one that is linked to the allegations in the Complaint and to either the Consumer Fraud Act or its caselaw. And if the argument here is about construction code violations triggering Consumer Fraud Act claims, that argument would seem to be a hard one to make out. <u>See</u> <u>Francis E. Parker Mem'l Home, Inc.</u> v. <u>Georgia-Pacific LLC</u>, 945 F. Supp. 2d 543, 564 (D.N.J. 2013) ("[A] violation of the Construction Code <u>in</u> and <u>of</u> <u>itself</u> is not actionable under the CFA.") (emphasis in original). But no matter for now. The Plaintiff is simply not pressing a regulatory-violations Consumer Fraud Act argument in any meaningful sense.

21

enforced by TCCWNA are drawn from other legislation.  One such piece of legislation is the C[onsumer] F[raud] A[ct]." <u>Watkins</u> v. <u>DineEquity, Inc.</u>, 591 F. App'x 132, 134 (3d Cir. 2014).

Here, the Plaintiff builds his TCCWNA claim solely on his Consumer Fraud Act claim.  <u>See</u> Complaint ¶ 140.  That the latter claim cannot go forward means that the TCCWNA claim cannot either.  <u>See</u> <u>Mladenov</u> v. <u>Wegmans Food Mkts., Inc.</u>, 124 F. Supp. 3d 360, 380 (D.N.J. 2015).

The TCCWNA claim is dismissed.

### C.   The Remaining Claims

There are two remaining claims, for breach of implied warranty and for unjust enrichment.  <u>See</u> Complaint ¶¶ 111-17, 128-34.

Each of these claims would need to clear a potentially difficult statute of limitations hurdle (though assessing a time-bar argument here may require either some highly targeted discovery, or some legal argument from the parties as to pleading standards and pleading burdens as to equitable tolling).

In addition, the implied warranty and unjust enrichment claims present certain legal issues of their own.

For example, as the Court noted by text order last month, the question of implied warranty "subsumption" under the New Jersey Product Liability Act was not initially briefed.  The Court allowed the parties to address this oversight in a one-page letter, but upon reviewing the letters, further briefing would appear to be required.

The parties should be permitted an opportunity to reflect on how they wish to proceed.  A separate Order, issued today, will provide a chance for them to do so.

### V.   Conclusion

For the reasons set forth above, the Defendants' motion to dismiss is granted in part.

It is on this 4th day of November, 2024, so **ORDERED**.

_____

Michael E. Farbiarz, U.S.D.J.