UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SALVATORE AND LISA BADALAMENTI, on behalf of themselves and the Putative Class, *Plaintiffs*, v. RESIDEO TECHNOLOGIES, INC. and HONEYWELL INTERNATIONAL INC., *Defendants*. | No. 22-cv-05592 (MEF)(CF) **OPINION and ORDER** |

**Table of Contents**

I.   **Background**
    A.   **The Allegations**
    B.   **Procedural History**
    C.   **The Motion**
    D.   **The Court's Approach**
II.  **Unjust Enrichment**
    A.   **New Jersey Cases**
    B.   **Federal Court Cases**
    C.   **Other Jurisdictions**
    D.   **Next Steps**
        1.   **Shazo**
        2.   **Products Liability**
        3.   **Werwinski**
III. **The Implied Warranty**
    A.   **State Cases**

      **B.**    <u>**Sun Chemical**</u>

**IV.**  <u>**The Remaining Claims**</u>

      **A.**    <u>**False Statement Claims**</u>

      **B.**    <u>**Statutory Claims**</u>

**V.**  <u>**Conclusion**</u>

\*    \*    \*

Two people bought home alarms, and came to believe the alarms had a defect.

They sued the alarm manufacturers, pointing to (a) the alleged defect and (b) alleged misrepresentations in the instructions that came with the alarms.

The manufacturers now move to dismiss.

The motion is granted.

\*    \*    \*

**I.**  <u>**Background**</u>

      **A.**    <u>**The Allegations**</u>

The allegations, as relevant for now, are as follows.[1]

---

[1] Because this is a motion to dismiss, the Court must treat all the complaint's allegations as true. <u>See</u> <u>McTernan</u> v. <u>City of York</u>, 577 F.3d 521, 526 (3d Cir. 2009). Whether they are true --- that would be an issue for later in the case.

Two homeowners[2] had combination burglar and fire alarms[3] installed in their houses.  See Amended Class Action Complaint and Jury Demand ("Complaint") (ECF 44) ¶¶ 20-21, 30-31.[4]

The instructions[5] that came with the alarms indicated that they (the alarms) "met the requirements" put out by Underwriters Laboratories, Inc. and the National Fire Protection Association.[6] See id. ¶¶ 9, 12, 22-23, 25-27, 32-33, 35-37.

But the homeowners came to believe that a fire would interfere with the alarms' wiring --- so that, in an emergency, the control unit would "instantly shut down," resulting in what the homeowners feared would be "a catastrophic failure."  Id. ¶ 10.

As a result of this defect, the homeowners concluded, the alarms were "non-conforming" --- they did not measure up to the standards invoked on the alarms' instructions.  Id. ¶¶ 5-9, 13.

Per the homeowners, had they known all this, they would not have bought the alarms in the first place.  See id. ¶¶ 16, 29, 39, 52.

---

[2]  Salvatore Badalamenti and Lisa Badalamenti.

[3]  "Alarms" is shorthand for the product here, a "combination-listed single data-bus burglar and fire alarm system control units."  Complaint ¶ 5.  Salvatore Badalamenti alleges he had a Model Honeywell Vista 20P control unit installed in his residence.  See id. ¶ 21.  Lisa Badalamenti alleges she had a Model Honeywell Vista 128 BPT control unit set up in her house. See id. ¶ 31.

[4]  It is not clear who the homeowners bought the alarms from. But there is no meaningful allegation they bought them directly from the manufacturers.  See footnote 10 below.

[5]  "Instructions" here means the installation guide and the product detail sheet that came with the Model Honeywell Vista 20P control unit, see Complaint ¶ 25, and the manual and data sheet that accompanied the Model Honeywell Vista 128 BPT control unit.  See id. ¶¶ 34-35.

[6]  Underwriters Laboratories, Inc. "is a private entity" that "issues safety standards."  Badalamenti v. Resideo Tech., Inc., 755 F. Supp. 3d 534, 437 (D.N.J. 2024).  So is the National Fire Protection Association.  See About Us, National Fire Protection Association, https://www.nfpa.org/about-nfpa (last visited Oct. 27, 2025).

### B.  **Procedural History**

In light of the above, the homeowners sued two companies that manufactured the alarms.[7]  See id. ¶¶ 3-4.

From here, the homeowners are called "the Plaintiffs," and the manufacturers are called "the Defendants."

The lawsuit presses seven state-law claims.[8]

### C.  **The Motion**

The Defendants have moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

[7]  Honeywell International, Inc. and Resideo Technologies, Inc.

[8]  Three things.  First, one of the two current Plaintiffs had filed an earlier complaint, see Class Action Complaint and Jury Demand (ECF 1), and the Defendants moved to dismiss it.  See Notice of Motion to Dismiss Plaintiff's Complaint (ECF 13). That motion was granted in part.  See Badalamenti, 755 F. Supp. 3d at 549.  A new complaint was then filed.  See Complaint.  It is the current, operative complaint.  It adds a new plaintiff, plus some new factual allegations.  Second, the parties' briefs assume that New Jersey law controls.  See Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Defendants' Brief") (ECF 47-1) at 19, 23-25, 31, 33, 37, 40; Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Plaintiffs' Brief") (ECF 50) at 3-4, 14, 17, 26, 28-35; Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Defendants' Reply") (ECF 51) at 6, 10, 12-13.  So it does.  See Badalamenti, 755 F. Supp. 3d at 539 n.5; Dejewski v. Nat'l Beverage Corp., 735 F. Supp. 3d 511, 517 n.10 (D.N.J. 2024); Marino v. Brighton Gardens of Mountainside, 697 F. Supp. 3d 224, 229 (D.N.J. 2023).  Third, the normal rules of the road apply here.  To resolve a motion to dismiss, a court "must take note of the elements a plaintiff must plead to state a claim."  Connelly v. Lane Constr. Corp., 809 F.3d 780, 787 (3d Cir. 2016) (cleaned up).  It must identify those allegations in the complaint that are merely conclusory and set them aside as irrelevant.  See id.  The question then becomes: as to what is left, the remaining allegations, do they "plausibly give rise to an entitlement to relief?"  Id. (internal quotation marks omitted).  If they do, the motion must be denied.  If they do not, it must be granted.

The motion is before the Court.[9]

### D.  **The Court's Approach**

The Court's analysis is in three parts.

<u>First</u>, the Court assesses the Plaintiffs' unjust enrichment claim, and dismisses it --- because there is no direct relationship alleged between the Plaintiffs and the Defendants. <u>See</u> Part II.

<u>Second</u>, the Court takes up the Plaintiffs' implied warranty of merchantability claim, and dismisses it --- because that common-

---

[9]  The Defendants argue that the claims of one of the Plaintiffs were filed too late and therefore cannot be considered.  <u>See</u> Defendants' Brief at 38-40.  This is because that Plaintiff, Salvatore Badalamenti, allegedly got his alarm in July 2007. <u>See</u> Complaint ¶ 21.  But he filed this case in September 2022, <u>see</u> Class Action Complaint and Jury Demand (ECF 1) --- pressing forward with claims that have a four-year limitations period (the count four and five breach of warranty claims, <u>see</u> N.J. Stat. Ann. § 12A:2-725), and a six-year period (the rest of the claims, per N.J. Stat. Ann. § 2A:14-1).  Based on this, the Defendants argue that Salvatore Badalamenti's claims were eleven or nine years late in getting off the mark, and are therefore time-barred.  <u>See</u> Defendants' Brief at 38.  The response from the Plaintiffs is that the clock did not run for all of those years; it was stopped for the time it took Salvatore Badalamenti to discover the alleged defect --- and after he did, he filed his lawsuit promptly enough.  <u>See</u> Plaintiffs' Brief at 35-37. This dispute may present complex questions.  But there is no reason to wade into it.  This is because the Plaintiffs' claims do not work on the merits, as set out below in Parts II, III, and IV --- even on the assumption they were timely filed. (Courts often go forward in this way --- assuming that a claim is timely to sidestep a potentially knotty limitations-period question, and if the claim is to be dismissed on the merits anyway.  For some examples roughly along these lines, see <u>Lacy</u> v. <u>Nat'l R.R. Passenger Corp.</u>, 254 F. App'x 934, 936 n.1 (3d Cir. 2007); <u>Rodriguez</u> v. <u>U.S. Dep't of Just.</u>, 325 F. App'x 111, 112-14 (3d Cir. 2009); <u>Murphy</u> v. <u>Bd. of Educ.</u>, 106 F. App'x 746, 747 (2d Cir. 2004).)

law claim is pushed aside by the New Jersey Products Liability Act.  See Part III.

Third, the Court dismisses the remaining claims, mainly because the Plaintiffs' allegations are too conclusory.  See Part IV.

## II.  Unjust Enrichment

Start with the Plaintiffs' unjust enrichment claim.

The gist of the claim: the Plaintiffs bought the Defendants' alarms, and that enriched the Defendants --- but unjustly, the argument goes, because the alarms were not up to snuff.  See Complaint ¶¶ 29, 39, 156-59.

As part of their unjust enrichment claim, the Plaintiffs do not allege that they bought the alarms directly from the Defendants. See id. ¶¶ 21, 31 (alleging only that the Plaintiffs had the alarms "installed" in their homes --- without naming the entity that sold them the alarms or did the installing).[10]

---

[10]  At various places in the complaint, the Plaintiffs speak of the Defendants "selling" them alarms.  See Complaint ¶¶ 84, 91, 95.  But even giving the Plaintiffs all the inferences they are entitled to, see McTernan, 577 F.3d at 526, these here-and-there references do not change the picture.  The Plaintiffs press no allegations about, say, buying an alarm through the Defendants' website.  Or from one of the Defendants' brick-and-mortar stores (if they have any).  Or from a store operated by one of the Defendants' authorized dealers (again, if they have any).  And the complaint contains no allegations as to any time-of-sale interactions with the Defendants' employees.  Salespeople, for example, or technicians.  And moreover, the Plaintiffs do not suggest that their complaint should be read to allege a direct sale by the Defendants.  In the face of the Defendants' argument that a direct sale must be alleged, see Defendants' Brief at 33-34, the Plaintiffs do not contend that they have checked that box.  Rather, they fall back on a purely legal contention: that no direct sale is necessary.  See Plaintiffs' Brief at 30-31.  Given all this, the Court takes the complaint's scattered references to "selling" by the Defendants to the Plaintiffs as a figure of speech, not as a bona fide allegation of a direct sale.  The Defendants are manufacturers.  See Complaint ¶ 3-4.  And when it comes to manufacturers, "X sold me this" --- which is essentially what the complaint alleges --- does not, without more, imply a direct sale.  "Pepsi sold my friend this," does not convey that the friend bought a can of soda directly from

And per the Defendants, this means the Plaintiffs' unjust enrichment claim cannot get off the ground.

The reason why, according to the Defendants: New Jersey law allows consumers (like the Plaintiffs here) to press an unjust enrichment claim based on something they bought only when the defendant they sue is the company they directly bought the item from.  See Defendants' Brief at 33-34; Defendants' Reply at 13.

The Plaintiffs see it the other way.  New Jersey law, they contend, has no direct-buy requirement when it comes to unjust enrichment claims.  See Plaintiff's Brief at 30.

As to this back-and-forth, the Court determines that the Defendants' approach is the one that must be applied here.[11]

To see why, begin by noting a gap in the law.

_____

the company.    Bottom line: the Court does not take the Plaintiffs to be alleging that there was a direct sale to them from the Defendants.  And another point.  Even if, assuming arguendo, the Plaintiffs' complaint is taken as alleging a direct sale, any such allegation is not built out in any way.  There is no detail from the Plaintiffs as to how a direct sale might allegedly have unfolded.  Why does this matter?  Because the Court concludes that New Jersey law as applied here requires an allegation of a direct sale.  See Part II.D.3.  And as to the needed components of a claim, it is not enough --- even at the motion to dismiss stage --- to dress up a legal requirement (here, a direct sale) as a factual assertion.  More is needed.  A bare restatement of a legal element does not clear the bar, even if it is presented as a fact.  If a direct sale is needed (as the Court concludes) the Plaintiffs cannot simply say there was a sale and leave it at that.  That would potentially be allowed in a notice pleading regime.  But not under current caselaw.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 194 (2015); Salmon v. Acres Land Title Agency, Inc., 2025 WL 2163873, at *2 (D.N.J. July 30, 2025); see also Webb v. Hillside Mun. Police Dep't, 2025 WL 1899560, at *5 (D.N.J. July 8, 2025); Badalamenti, 755 F. Supp. 3d at 547 n.16.

[11]  A key note.  There is no suggestion that the alarms in question caused any physical damage to people or to other property.  That is, the Plaintiffs only allege economic loss.

New Jersey law governs, see footnote 8, and when it comes to New Jersey law, "the decisions of the [New Jersey] Supreme Court are the authoritative source." Spence v. ESAB Grp., Inc., 623 F.3d 212, 216 (3d Cir. 2010).

But the New Jersey Supreme Court has not ruled on the unjust enrichment/direct-buy question on the table here. See DeFrank v. Samsung Elecs. Am., Inc., 2020 WL 6269277, at *23 (D.N.J. Oct. 26, 2020) (noting this).[12]

---

[12] In 1945, New Jersey's then-top court, see Marino, 697 F. Supp. 3d. at 233 n.17, took up a case involving an indebitatus assumpsit action, see Hartford Accident & Indem. Co. v. Benevento, 133 N.J.L. 315, 322 (N.J. 1945) --- and the modern unjust enrichment claim has sometimes been described as "the lineal successor of the common [law] count in indebitatus assumpsit for money had and received." Stone v. White, 301 U.S. 532, 534 (1937). In the 1945 case, Hartford Accident, New Jersey's apex court indicated that where a party gains "inequitable enrichment at the expense of another . . . if necessary at all, privity may be implied from one's possession of another's money which in conscience he cannot retain." Hartford Accident, 133 N.J.L. at 322. Does this mean that New Jersey's highest court can be taken as having suggested that the "privity" for unjust enrichment purposes that might ordinarily be established by a direct sale can be established in another way --- based on an allegation that a defendant-manufacturer profited by sales made through a middleman-entity, like a retailer? The Court's view: no. Hartford Accident is too little to go on. It has not been cited by the New Jersey Supreme Court for around 45 years. See In re N.J. State Bd. of Dentistry, 84 N.J. 582, 587 (1980) (citing the case for a not-on-point proposition). And the parties here do not reference the case. Nor do any of the state or federal cases discussed in Parts II.A and II.B that take on the question of whether a direct sale is required under New Jersey unjust enrichment law. Moreover, it is not clear that Hartford Accident (which applies when X holds Y's money) should be applied where the connection is much looser --- where X, at some point, had Z's money, based on Z's hoped-for sale to customer Y). In addition, Hartford Fire is potentially relevant only by an analogy from one common-law claim (indebitatus assumpsit, at issue in Hartford Accident) to another (unjust enrichment, at issue here). But the analogy between them mainly holds up in circumstances that are far

Without an on-point decision by the New Jersey Supreme Court to go on, "this Court must predict how the New Jersey Supreme Court would answer the question."  Howard v. Wells Fargo Bank, N.A., 733 F. Supp. 3d 352, 356 (D.N.J. 2024).

In making this prediction, a federal court may consult a wide range of sources.  See In re Avandia Mktg. Sales Pracs. & Prods. Liabs. Litig., 588 F. App'x 171, 176 (3d Cir. 2014).

Here, three sorts of sources loom especially large.  Walk through them now, starting just below.

### A.  **New Jersey Cases**

State intermediate appellate opinions are generally a very useful source for predicting how a state supreme court might one day resolve an open legal question.[13]

---

afield from the ones here.  See, e.g., Alison Reppy, The Action of Indebitatus (General) Assumpsit --- at Common Law, under Modern Codes, Practice Act and Rules of Court (Continued) 34 N.D. L. Rev. 217, 230-31 (1958); but cf. Martin v. Sitwe (1690), 89 Eng. Rep. 509 (KB) (a failure of consideration case, that is arguably closer to the alleged failure of consideration here --- where the item paid for, an alarm, is said not to work).  In addition, in remarking that a privity requirement is satisfied by possession of money "if [privity is] necessary at all," Hartford Accident, 133 N.J.L. at 322 (emphasis added), Hartford Accident does not purport to say anything about the issue in play here --- whether, in fact, privity of a sort (a direct sale) is or is not "necessary," id., when it comes to an unjust enrichment claim.  (A determination as to whether privity is necessary would typically come early in the analysis, before an explanation as to how any privity obligation might be satisfied.  But that point, about the ordinary order of operations, does not impact the Court's reading of the quoted Hartford Accident passage.  See, e.g., Khalil v. Joyce, 780 F. Supp. 3d 476, 507 n.28 (D.N.J. 2025) (explaining why).)

[13]  See C.I.R. v. Bosch's Est., 387 U.S. 456, 465 (1967); see also Wayne Moving & Storage of N.J., Inc. v. School Dist., 625 F.3d 148, 154 (3d Cir. 2010); Schulman v. Zoetis, Inc., 684 F. Supp. 3d 275, 279 (D.N.J. 2023); Howard, 733 F. Supp. 3d at 356;

Generally, but not always.  And not here.

The reason: the on-point New Jersey intermediate appellate cases are sparse and split.  So the signal they send off is both faint and equivocal.

Look now to the three key New Jersey appellate cases.

\*    \*    \*

The stepping off point is Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105 (App. Div. 1966).

There, a nursery planted some shrubs at a house that was under construction.  See id. at 107.  The shrubs were to be paid for by the person slated to move in.  See id.  But after he died during construction, ownership of the house went over to the housing developer, and no one paid the nursery for the landscaping work it had done.  See id.

The nursey pressed an unjust enrichment claim against the developer.  The theory: the developer was enriched (the house it now owned had shrubs) but this was unjust (because no one had paid for them).  See id. at 108.

The nursery lost the case.

Why?  Per the Callano court: unjust enrichment claims must generally "involve . . . some direct relationship between the parties."  Id. at 109.  But there had been no "dealings" between the nursery and the developer.  Id.  That is, there was no "direct relationship," id., between them.  Rather, the nursery's arrangement had been with the man was supposed to occupy the house but who had passed away.  See id.

\*    \*    \*

Callano points in this direction: under New Jersey law, a plaintiff can make out an "unjust enrichment" claim only if he had a "direct relationship" with the person or entity he sues.  Id.

And another appellate case, Fasching v. Kallinger, 211 N.J. Super. 26 (App. Div. 1986), tilts the same way.

---

18W Holdings, Inc. v. Sing for Serv., LLC, 763 F. Supp. 3d 651, 660-61 (D.N.J. 2025).

In <u>Fasching</u>, the family of a murder victim sued an author, publishers, and lawyer who had worked together to put out a book on the murder. <u>See</u> 211 N.J. Super. at 30-31.

This was unjust enrichment, the victim's family claimed. The book publishers were enriched (by selling the book), but unjustly (because book sales were gained based on the murder). <u>See</u> <u>id</u>. at 29, 35-36.

But the court cut off the claim: the plaintiff family members did not "allege any direct relationship" with the publisher defendants. <u>Id</u>. at 36. Without that, their unjust enrichment claim could not go forward. <u>See</u> <u>id</u>. at 36.

*    *    *

Read <u>Callano</u> and <u>Fasching</u>, and a "direct relationship" between the plaintiff and the defendant seems to be required for New Jersey unjust enrichment claims.

But in the end, the needle does not point that way steadily. Rather, it bounces around --- because there is another data point, that exerts its own pull, and in a different direction.

*    *    *

To see it, move to <u>Shazo</u> v. <u>Martino</u>, 2019 WL 3315643 (N.J. Super. Ct. App. Div. July 24, 2019).

The facts there: a house was foreclosed on and auctioned off by the sheriff; but before the new purchaser moved in, the old owner racked up some costs but did not cover them. <u>See</u> <u>Shazo</u>, 2019 WL 3315643, at *1. When the new owner showed up, there were post-auction property taxes and sewer charges to pay. <u>See</u> <u>id</u>.

The new owner sued the old owner for unjust enrichment. <u>See</u> <u>id</u>. The old owner had been enriched (she got, among other things, sewage services) but this was unjust (because the bill was left for the new owner). <u>See</u> <u>id</u>. at *1-2.

The old owner argued that the unjust enrichment claim could not work. Per the old owner, there was "no direct relationship between her and [the new owner]" because the new owner bought the house after it had been foreclosed. <u>See</u> <u>id</u>. at *1.

Based on <u>Callano</u> and <u>Fasching</u>, that might have been expected to be a winning argument.

But the Shazo court turned the argument aside.

It allowed the unjust enrichment claim to go forward, even without a direct sale, reasoning that "a relationship existed between the parties warranting plaintiff's recovery under unjust enrichment." Id. at *3.

\*    \*    \*

Where things stand.

Callano and Fasching are two intermediate appellate cases.  They suggest that to make out a New Jersey unjust enrichment claim, there must be a "direct relationship" between the plaintiff and the defendant, without a third-party pass-through.

That cuts against the availability of an unjust enrichment claim in this case.  The Plaintiffs (consumers) do not allege they had a direct relationship with the Defendants (manufacturers), except through middlemen (whoever sold the Defendants' alarms to the Plaintiffs).

But Callano and Fashing are not the end of it.

Shazo is another intermediate appellate case, and it seems to run the other way --- allowing a New Jersey unjust enrichment claim even without a direct relationship.

A 2-to-1 tally (Callano and Fashing on the one hand, Shazo on the other) represents no "deep consensus as to what the law is." Navigators Specialty Ins. Co. v. Citizens Ins. Co. of Am., 739 F. Supp. 3d 259, 266 (D.N.J. 2024).  There is, as to the open question here, only "a relatively sparse body of cases (only three)," and these "are close to being evenly split."  Id.

Thus, these "lower [state] court decisions supply a basis for predicting how the [New Jersey] supreme court will rule --- but here, not a strong one."  Id. at 266.[14]

---

[14]  At first glance, a New Jersey Supreme Court decision, VRG Corp. v. GKN Realty Corp., 135 N.J. 539 (1994), might seem relevant to breaking the lower-court stalemate.  In VRG, a real-estate broker agreed with a shopping center owner to help the owner find tenants.  See id. at 542-43.  The shopping center was sold, and the broker was never paid.  See id. at 542-43.  The broker then sued, seeking an equitable lien on the new shopping center owner's rental income.  See id. at 545.  Because unjust

**B.   Federal Court Cases**

Move now to federal decisions applying New Jersey law.

The decisions of federal courts "that reach and resolve the open state law question" can help to inform a court's prediction as to what state law is.  Badalamenti, 755 F. Supp. 3d at 541.

But here, same problem as above --- the federal opinions pull in different directions.

Some hold that a direct relationship between the plaintiff and the defendant is required under New Jersey law for an unjust enrichment claim.  Others go the opposite way.

Tick through some federal cases that interpret New Jersey law to require a direct relationship:

- A consumer bought a smartwatch from a cell phone carrier's store.  See Noble v. Samsung Elecs. Am., Inc., 2018 WL 801590, at *1 (D.N.J. Feb. 8, 2018).  But there were battery problems, so the buyer sued.  See id.  The district court rejected the consumer's unjust enrichment claim, concluding that "a manufacturer cannot be held liable for

---

enrichment can be a basis for an equitable lien, the New Jersey Supreme Court considered an unjust enrichment theory --- and rejected it.  See id. at 548, 553-55.  Was this because there was no direct relationship between the party that sought the lien (the real-estate broker) and the other entity (the new shopping center owner)?  No.  The Supreme Court's decision turned on lack of enrichment in the first place.  See id. (explaining that the new shopping center owner, who had paid "fair market value for the shopping center, did not receive an unexpected benefit or undeserved windfall").  Therefore, New Jersey's high court never had to grapple with whether there would have been a viable unjust enrichment claim (even though there was no direct relationship) if there had been enrichment.  Accordingly, VRG is not on point, and other courts have read the case in essentially that way.  See, e.g., DeFrank, 2020 WL 6269277 at *24 (observing that the new owner in VRG "had derived no benefit from the [former owner's] broken promise"); Stewart v. Beam Glob. Spirits & Wine, Inc., 877 F. Supp. 2d 192, 200 (D.N.J. 2012) (noting that the new owner in VRG "did not unjustly retain a benefit"); see also Julian v. TTE Tech., Inc., 2020 WL 6743912, at *6 (N.D. Cal. Nov. 17, 2020).

unjust enrichment if the plaintiff purchased the product at issue from a third-party." Id. at *7.

- A consumer purchased a car, but some engine parts did not work right. See DiMartino v. BMW of N. Am., LLC, 2016 WL 4260788, at *1 (D.N.J. Aug. 11, 2016). The district court rejected the car-buyer's unjust enrichment claim, because he was "an indirect purchaser," id. at *7, not having bought straight from the manufacturer.

- A consumer leased a BMW that had "single turbocharger engines," but ads suggested the car was better than that -- that it had "'TwinPower Turbo' engines." Bedi v. BMW of N. Am., LLC, 2016 WL 324950, at *1 (D.N.J. Jan. 27, 2016). Because the lessee got his car "from an authorized BMW retailer, not BMW itself," the district court held that he had "not stated a claim for unjust enrichment." Id. at *6.

- Consumers bought washing machines that allowed mold and mildew to build up, so they sued the company that made the machines. See Fishman v. Gen. Elec. Co., 2013 WL 1845615, at *1 (D.N.J. Apr. 30, 2013). But none of the consumers bought their machines "directly" from the defendant, id. at *6, so the district court did not allow the unjust enrichment claim. "Under New Jersey law, an indirect purchaser cannot succeed on a claim for unjust enrichment." Id. at *6.

- Two defendants advertised that their machines would brew a certain amount of coffee. See Green v. Green Mountain Coffee Roasters, Inc., 279 F.R.D. 275, 278, 278 (D.N.J. 2011). But the machines were making less. See id. Could there be an unjust enrichment claim? The district court said no, because "[e]ssential to an unjust enrichment claim is a direct relationship between the plaintiff purchaser and the defendant." Id. at 283.

The federal cases cited above suggest that New Jersey law is this: no direct relationship between the plaintiff and the defendant, no unjust enrichment claim by the plaintiff against the defendant.

But that is not the end of the line. Other federal cases interpret New Jersey law in the opposite way.

Some examples:

- Consumers bought dryers that posed a fire risk from stores like Home Depot and Best Buy, see DeFrank, 2020 WL 6269277,

at *1-3, but sued the manufacturer.  See id. at *2.  The district court noted that some courts have held that New Jersey unjust-enrichment law requires a direct relationship, but went the other way: "[t]he 'direct relationship' required does not rule out finding a manufacturer liable despite the presence of a third-party intermediary."  Id. at *23.

- Consumers bought TVs that had been marketed as generating sharp images --- but the sets did not work that way.  See Julian v. TTE Tech., Inc., 2020 WL 6743912, at *1 (N.D. Cal. Nov. 17, 2020).  The TV buyers sued the TV manufacturers even though they had bought the sets from Walmart.  See id. at *6.  The manufacturer emphasized that this was a no-direct-relationship situation, see id., but the court held that the lack of a direct relationship "does not automatically bar the[] claim for unjust enrichment." Id. at *7.

- The ads for "Skinny Girl Margarita" suggested the drink was healthy.  See Stewart v. Beam Glob. Spirits & Wine, Inc., 877 F. Supp. 2d 192, 193-94 (D.N.J. 2012).  But consumers sued, alleging that the premade cocktails had a possible carcinogen.  See id. at 194.  The district court allowed the consumers' unjust enrichment claim to advance, concluding that "it would be inequitable to suggest that the [manufacturer defendants] can insulate themselves from liability on an unjust enrichment claim simply by asserting that retail sales by liquor stores cut off any relationship between the consumers and the manufacturer."  Id. at 200.

### C.   Other Jurisdictions

The New Jersey cases are close to evenly split.  See Part II.A. And the federal cases interpreting New Jersey law are divided, too.  See Part II.B.

What about cases from other parts of the country?

As a general matter, it makes sense to predict the relevant state's law based on the law from other parts of the Nation.[15]

_____

[15]  If states A, B, C, and D see the solution to a legal problem in a particular way, then that makes it likelier that state X will land on the same approach.  See Spence, 623 F.3d at 216; cf. Courney v. City of Englewood, 2025 WL 2170694, at *7 n.21 (D.N.J. July 30, 2025).  And all the more so when state X is

But here, starting down that path does not make things any clearer. Because before too long, there is a familiar fork in the road.

The law of <u>some</u> states allows indirect-purchaser-plaintiffs to press unjust enrichment claims against manufacturers. <u>See</u>, <u>e.g.</u>, <u>In re TFT-LCD (Flat Panel) Antitrust Litig.</u>, 2011 WL 4345446, at *4 (N.D. Cal. Sept. 15, 2011) (concluding that no direct relationship is required under Missouri law, as courts have "allowed an unjust enrichment claim to proceed where the plaintiff alleged that the benefit was passed along 'in the chain of commerce'"); <u>Bank of Am. Corp.</u> v. <u>Gibbons</u>, 173 Md. App. 261, 271 (2007) ("The court also erroneously required direct dealings . . . . [A] cause of action for unjust enrichment may lie against a transferee with whom the plaintiff had no contract, transaction, or dealing, either directly or indirectly."); <u>see also</u> <u>Boone River, LLC</u> v. <u>Miles</u>, 314 Neb. 889, 895 (2023); <u>Buttonwood Tree Value Partners, L.P.</u> v. <u>R. L. Polk & Co., Inc.</u>, 2023 WL 9053173, at *9 (Del. Ch. Dec. 29, 2023); <u>Myun-Uk Choi</u> v. <u>Tower Rsch. Cap. LLC</u>, 890 F.3d 60, 69 (2d Cir. 2018) (New York law); <u>New Prime, Inc.</u> v. <u>Harris Transp. Co.</u>, 2012 WL 3192718, at *4 (N.C. Ct. App. Aug. 7, 2012); <u>Town of New Hartford</u> v. <u>Conn. Res. Recovery Auth.</u>, 291 Conn. 433, 468 (2009); <u>Metric Constructors, Inc.</u> v. <u>Bank of Tokyo-Mitsubishi, Ltd.</u>, 72 F. App'x 916, 921 (4th Cir. 2003) (North Carolina law); <u>State Dep't of Hum. Servs. ex rel. Palmer</u> v. <u>Unisys Corp.</u>, 637 N.W.2d 142, 155 (Iowa 2001); <u>Salzman</u> v. <u>Bachrach</u>, 996 P.2d 1263, 1265 (Colo. 2000); <u>cf.</u> Restatement (Third) of Restitution and Unjust Enrichment § 47.

But the law of <u>other</u> states seems to be 180 degrees away, requiring a direct relationship for a plaintiff-consumer to press an unjust enrichment claim against a defendant-manufacturer. <u>See</u>, <u>e.g.</u>, <u>A & M Supply Co.</u> v. <u>Microsoft Corp.</u>, 2008 WL 540883, at *2 (Mich. Ct. App. Feb. 28, 2008) ("Plaintiff here can point to no similar direct contact between Microsoft and the indirect purchasers in the class they seek to have certified. Nor can they show that Microsoft received any direct payment or other benefit from those purchasers."); <u>see also</u>

---

affirmatively committed to sticking fairly close to other states' laws, <u>see</u> <u>Navigators</u>, 739 F. Supp. 3d at 268-69 --- and that seems to be New Jersey's general approach when it comes to the state's products-liability jurisprudence. <u>See</u> <u>Badalamenti</u>, 755 F. Supp. 3d at 542 (collecting cases).

<u>Graham</u> v. <u>Take-Two Interactive Software, Inc.</u>, 2020 WL 408408, at *2 (S.D.N.Y. Jan. 24, 2020) (New York law); <u>Kopel</u> v. <u>Kopel</u>, 229 So.3d 812, 818 (Fla. 2017); <u>Doe I</u> v. <u>Wal-Mart Stores, Inc.</u>, 572 F.3d 677, 685 (9th Cir. 2009) (California law).

To see the opposing camps, line up two state Supreme Court decisions, from Tennessee and Ohio.

In <u>Freeman Industries, LLC</u> v. <u>Eastman Chemical Co.</u>, 172 S.W.3d 512 (Tenn. 2005), a company that was an "indirect purchaser," <u>id</u>. at 516, of food preservatives sued preservatives-makers for price-fixing.  <u>See id</u>.  The Tennessee Supreme Court allowed the claim.  <u>See id</u>. at 526.  The plaintiff-company, it reasoned, "may bring a cause of action for unjust enrichment against the defendants even though [the company] did not purchase the items containing sorbates directly from the defendants."  <u>Id</u>. at 525.

In <u>Johnson</u> v. <u>Microsoft Corp.</u>, 834 N.E.2d 791 (Ohio 2005), a computer-buyer sued Microsoft for "monopolistic pricing practices with respect to its operating systems."  <u>Id</u>. at 279.  But the Ohio Supreme Court did not allow an unjust enrichment claim.  <u>See id</u>. at 286.  "The facts in this case demonstrate that no economic transaction occurred between Johnson and Microsoft, and, therefore, Johnson cannot establish that Microsoft retained any benefit to which it is not justly entitled."  <u>Id</u>. (cleaned up).

Bottom line: the split in the New Jersey intermediate appellate cases and the split in the federal cases interpreting New Jersey law --- these track broader national splits.  The Nation's courts are divided as to whether a plaintiff-consumer can press an unjust enrichment claim against a defendant-manufacturer without a direct relationship to the manufacturer.

     D.   **<u>Next Steps</u>**

How to break the deadlock and find the New Jersey "rule[] of decision," 28 U.S.C. § 1652, to apply here?

There are any number of possibilities.

Take up two just below, and then --- because they do not work --- look to a third.

### 1.    **Shazo**

A first approach to breaking the logjam: maybe the most recent New Jersey intermediate appellate case, the 2019 decision in Shazo v. Martino, should be given extra weight in the balance.

That case, as discussed above, seems to indicate that there does not need to be a direct plaintiff/defendant relationship for an unjust enrichment claim.  See Shazo, 2019 WL 3315643, at *2-3; Part II.A; see also DeFrank, 2020 WL 6269277, at *24

Why might it make sense to lean especially heavily on Shazo?

Because it is recent.  And because New Jersey law generally aims to track national products-liability trends.  See footnote 15. And across the country, there seems to be some movement to the no-direct-relationship-needed position described in Shazo.  See, e.g., Earhart v. William Low Co., 600 P.2d 1344, 1348 (Cal. 1979) (embracing academic criticism of "the requirement of a 'direct benefit' to the defendant as 'purely an historical one'"); Lau v. Constable, 2017 WL 536361, at *5 (N.C. Super. Ct. Feb. 7, 2017) (noting that North Carolina's courts had moved towards a recognition that "an indirect benefit can support an unjust enrichment claim"); cf. Andrew Burrows, Unjust Enrichment and Restitution, in The Oxford Handbook of New Private Law 293, 301-306 (Andrew S. Gold et al. eds., 2020).

But ultimately it is not clear that Shazo should punch above its weight.[16]

Two reasons are set out here.

*    *    *

First, Shazo is a long way factually from a products liability-type case like this one --- and the differences may well matter.

Recall that the new homeowner in Shazo was allowed to sue the old homeowner for unjust enrichment.  See Shazo, 2019 WL 3315643 at *3.  The passing-the-baton relationship between the two was not direct as a formal matter, because the house had first been

---

[16]  And note that even if it does, Shazo remains on the short end of a 2-1 split in the New Jersey intermediate appellate cases. See Part II.A.

foreclosed on and then listed at a sheriff's sale --- where it was bought by the new homeowner.  See id. at *1.

But the fact that there would be a handover relationship between an old homeowner and a new one was perfectly foreseeable.

And this seemed important to the Shazo court, in allowing the unjust enrichment claim despite the lack of a direct relationship.  See id. at *3 (concluding the old owner "either knew or should have known that she would be responsible for those payments").

All of this takes Shazo far afield from the products liability-type context at issue here --- in this case.

To see why, note that when it comes to orthodox products liability cases, not ones that sound in unjust enrichment, courts have generally not imposed downstream liability in cases, like this one, where there has been no physical damage, where only economic losses are on the table.

Why?

In part because of a sense that manufacturers should not be required to insure (via tort) the possibly disparate expectations of the many different people who might one day choose to go to the store and buy the manufacturer's product. After all, the argument goes, each customer may pay her own purchase price and bring her own expectations --- as to what she will get out of the product, and how she will use it.  See E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871-73 (1986); Pa. Glass Sand Corp. v. Caterpillar Tractor Co., 652 F.2d 1165, 1169 (3d Cir. 1981); Seely v. White Motor Co., 63 Cal. 2d 9, 18-19 (Cal. 1965);  Catherine M. Sharkey, The Remains of the Citadel (Economic Loss Rule in Products Cases), 100 Minn. L. Rev. 1845, 1849, 1881-82 (2016); William K. Jones, Product Defects Causing Commercial Loss: The Ascendancy of Contract over Tort, 44 U. Mia. L. Rev. 731, 765-66 (1990); cf. VRG, 135 N.J. at 553-55.

But this is a long way from the Shazo situation, of a person moving into a house and expecting the obvious --- that there will have been a prior resident, and that the prior resident will have taken care of the sewage costs for the period when she lived there.  See Shazo, 2019 WL 3315643 at *3.

These are not bespoke expectations, or surprising ones.

And the fact that these sorts of obvious, everyday expectations can be enforced via an unjust enrichment claim (as in Shazo) does not necessarily suggest that expectations can be enforced via an unjust enrichment claim in other contexts --- like in the context here, of an only-economic-harm product liability-type case, where different parties' expectations (and planned uses for a product) may be much harder to guess at in advance.

In a nutshell, Shazo is potentially a different sort of case than this one.

So even if the Court were to foreground it in the predicting-state-law analysis, it is not clear that Shazo's unjust enrichment rule (no direct relationship needed) should be applied in a products-liability-type case, like the one here.

\*     \*     \*

A second possible difficulty with leaning too heavily on Shazo is more fundamental.

Namely, it may not make sense to treat Shazo as an unjust enrichment case at all, even though the Shazo court used that terminology.

To see the point, look back to what we would today call land-use law, as it existed at around the time of the Founding.

At that time, a question that came up with some frequency was this: what should be done when someone thinks they have title to a piece of land, and works it --- only to later learn that the land is actually someone else's?  Who gets to keep the value of the improvements --- the person who made them, who laid down the stone wall or built the water pump, or the person who was the true owner of the land all along?

The classic common law answer was this: the person who made the improvements could get financial credit for them, but only in a limited situation --- where he was first sued for back rent or back profit by the true landowner.  Then, the value of the improvements he had made to the land could be used to offset whatever he owed to the true owner.  See Griswold v. Bragg, 48 F. 519, 521 (D. Conn. 1880) (describing the law of England and "the state of law in this country, in 1841"); see also Green v. Biddle, 21 U.S. (8 Wheat.) 1, 81-82 (1823); Coulter's Case (1598) 77 Eng. Rep. 98, 98-99 (KB); Putnam v. Ritchie, 6 Paige

Ch. 390, 403-05 (N.Y. Ch. 1837); Gill v. Patten, 10 F. Cas. 376, 378 (C.C.D.C. 1807) (No. 5428).

So a person who built a $5 stone wall could (partially) defend against a lawsuit for $20 in back rent by saying "the claim is really only for $15 because I put in a wall." But that was it. The wall-builder could not try on his own to get compensated for the wall; he could try to get the $5 only if, first, he was sued.

But during the early 1840s, Justice Story, riding circuit, went a different way. See Bright v. Boyd, 4 F. Cas. 134, 135 (C.C.D. Me. 1843) (No. 1876) (Story, J.); Bright v. Boyd, 4 F. Cas. 127, 132-34 (C.C.D. Me. 1841) (No. 1875) (Story, J.).

He held that the person who made the improvements could affirmatively go to court to claim the improvements' value. See Bright, 4 F. Cas. at 135; see also Valle's Heirs v. Fleming's Heirs, 29 Mo. 152, 158-62 (1859); Griswold, 48 F. at 521-22.

Under Justice Story's rule, the person who laid down the stone wall could sue, as a plaintiff --- and affirmatively try to get back the value of the wall he had put in. He could, himself, file a free-standing lawsuit seeking $5 for the wall --- not just bring up the $5 improvement defensively, in response to a back-rent or back-profits lawsuit from the true owner.

This rule was adopted in many jurisdictions. See Valle's Heirs, 29 Mo. at 161; Union Hall Ass'n v. Morrison, 39 Md. 281, 293-96 (1874); McPhee v. Guthrie & Co., 51 Ga. 83, 88-89 (1874); Hatcher v. Briggs, 6 Or. 31, 42, 48 (1876); Griswold, 48 F. at 522; but see Restatement (Third) of Restitution and Unjust Enrichment § 10 cmt. b (A.L.I. 2011) (describing the persistence of "the restrictive rule of the English common law," as reflected in various state statutes).

Justice Story's case (and the rule it laid down) looks something like the Shazo case (and the rule it laid down).

As land passed from one person's hands to another person's hands in Justice Story's case, one party (the true owner) might receive an unjustified benefit (land improvements) at the expense of another party (the person who had possessed the land and worked it) --- so the latter party could sue for the value of that benefit.

And as land passed from one person's hands to another's in the Shazo case, the same worry: one party (the old owner) might receive an unjustified benefit (free sewage services and the like) at the expense of another party (the new owner) --- so the latter party could sue for the value of that benefit.

In each case, the rule applied certainly seems related to the basic concerns that animate unjust enrichment law --- concerns for fairness, and for making people pay (in the form of restitution) for benefits they get.

No surprise, then, that some courts have treated the land-use rule articulated by Justice Story as a part of unjust enrichment law.  See, e.g., Garfield ex rel. ODP Corp. v. Allen, 277 A.3d 296, 348 (Del. Ch. 2022) (characterizing Bright v. Boyd as opening the door to unjust enrichment claims in American courts of equity); Somerville v. Jacobs, 153 W. Va. 613, 617-18 (1969) (citing Bright v. Boyd as an "early" example of courts "sustain[ing] the jurisdiction of a court of equity to award compensation to the improver to prevent unjust enrichment to the owner"); Comer v. Roberts, 252 Or. 189, 193 (1968) (same); Schleicher v. Schleicher, 182 A. 162, 164-65 (Conn. 1935) (describing Green v. Biddle and Bright v. Boyd as addressing "principles involved in the doctrine generally referred to as that of "unjust enrichment'"); Golde Clothes Shop Inc. v. Loew's Buffalo Theaters Inc., 236 N.Y. 465, 471 (1923) ("There has been no such unjust enrichment as results from the permanent appropriation of improvements by an owner of the fee."); see also Developments in the Law-Unjust Enrichment Chapter One: The Intellectual History of Unjust Enrichment, 133 Harv. L. Rev. 2077, 2085-86 (2020) (identifying cases like Bright v. Boyd and Griswold v. Bragg as illustrating how "[t]he principle of unjust enrichment was clearly articulated in early American equity cases").

And no surprise that Shazo, applying what seems like a variant on Justice Story's land-use rule, spoke of unjust enrichment. See Shazo, 2019 WL 3315643, at *2-3.

But does it ultimately make sense to treat the Justice Story land-use rule and its Shazo variant as bona fide threads in the broader fabric of unjust enrichment law?

The case for "yes" is thin.  A shared concern for fairness is not much to go on.  It proves too little.  Large areas of our

law are built on the animating idea of fairness, but that is not enough to treat them as lumped together in the same doctrine.[17]

In short, as to (a) unjust enrichment law and (b) the Justice Story/Shazo land-use rules about what successive property users owe to each other --- the link between them may well be too generic to establish a real family resemblance.

History underscores the point.

When it comes to (a) and (b), unjust enrichment law and the referenced land-use rules, there are no crossing lines in the genealogy chart.  The two doctrines originated separately, one from the next.

Modern unjust enrichment law springs from Lord Mansfield's opinion in Moses v. Macferlan (1760) 97 Eng. Rep. 676 (KB).  See Andrew Kull, James Barr Ames and the Early Modern History of Unjust Enrichment, 25 Oxford J. Legal Stud. 297, 310 (2005) (noting this).  Soon after, William Blackstone drew upon Moses in his Commentaries on the Laws of England.  See Developments in the Law, 133 Harv. L. Rev. at 2083.  And before long, the unjust enrichment doctrine that had begun to grow from Moses was potted into the soil of American law.  See Kull, James Barr Ames, 25 Oxford J. Legal Stud. at 311-13.

But all of that is far afield from the land-use rule laid down by Justice Story in 1841.

Moses, the Lord Mansfield case, was about "an action upon the case for money had and received."  Moses, 97 Eng. Rep. at 676.

---

[17]  And it would seem that Justice Story's land-use rule likely turned on his answers to questions that have everything to do with the law of real property and land-use --- but that have no real echo in unjust enrichment law more generally.  Questions like the following.  When a person builds something (like a stone wall) does he gain a property interest in it through his work?  See Pim Brands, Inc. v. New Cibo Vita LLC, 2025 WL 2938602, at *3 n.8 (D.N.J. Oct. 16, 2025).  Should people be incentivized to build and improve land (by being allowed to go to court and claim the value of their improvements even if title turns out to be wrong)?  Or should people be incentivized to clarify who has title to land and maybe to buy title insurance (by not being allowed to go to court and claim the value of their improvements if title turns out to be wrong)?

By contrast, "enrichment resulting from a mistaken improvement could not be reached by an orthodox action in money had and received."  See Kull, James Barr Ames, 25 Oxford J. Legal Stud. at 315.

This is a basic difference, and it is part of what made Justice Story's decision pathbreaking.

Justice Story canvassed a wide array of authorities "to go further," as he put it, "and to grant active relief" to land possessors who made improvements while wrongly thinking they had title.  See Bright, 4 F. Cas. at 133.

Justice Story drew upon common law maxims.  See id. at 132-33.  Roman law.  See id. at 133-34.  The contemporary laws of France, Scotland, and Spain.  See id. at 133-34.  And the writings of Grotius, Puffendorf, and Rutherforth.  See id. at 134.

But Justice Story had to range so far because there was no answer closer to home.  As Justice Story put it, there was "no case in England or America, where the point had been expressed or decided either way."  Id. at 133; see Kull, James Barr Ames, 25 Oxford J. Legal Stud. at 315.

Extant Anglo-American law --- including the unjust enrichment law that had come down from Lord Mansfield in Moses --- was understood by Justice Story to be simply off point.[18]

Justice Story did not cite Moses, the case that has come to be understood as the forerunner of the modern law of unjust enrichment.  Moreover, he did not cite any case that itself cited Moses.

Bottom line: there is a strong argument that unjust enrichment law and the law of successive landowners (applied by Justice Story in 1841 and applied more recently in Shazo) are simply not the same thing.  They come from different place, and occupy different corners of the law.[19]

---

[18]  And this even though Justice Story was familiar with Moses.  His equity treatise, published in its second edition two years earlier, cited Moses.  See Joseph Story, 2 Commentaries on Equity Jurisprudence § 1256 n.2 (2d ed. 1839).

[19]  So why do some cases, including Shazo, speak of the successive-landowner-situation in unjust enrichment terms?  Hard to say.  But there are legal terms --- like "discretion" or

This supplies another reason not to lean too heavily on Shazo, and a fundamental one: Shazo, properly understood, may not be an unjust enrichment case at all --- which means that its holding (no-direct-relationship needed) may not shed meaningful light on the question here, of whether a direct relationship is needed in what is undoubtedly an unjust enrichment case.

Shazo, in short, clarifies the way in which successive real-property owners should be treated under New Jersey law.  But maybe not New Jersey unjust enrichment law.

*    *    *

To summarize:

The cases are deadlocked as to whether a direct relationship is needed in unjust enrichment cases, see Part II.A to Part II.C, and one way to break the standstill is to rely more heavily on the relatively recent Shazo decision, which suggests that under New Jersey law a direct relationship is unnecessary.

But this is not fully persuasive.

First, Shazo is far afield.

It did not require a direct relationship in a case in which the relevant plaintiff/defendant expectations were perfectly obvious in advance.  But in products cases (like this one), courts often impose a direct relationship requirement precisely because plaintiff-consumer expectations for a product (and consumers' uses of a product) are disparate and therefore hard to predict in advance --- and therefore something that a defendant-manufacturer should have to be responsible for.

And second, Shazo may best understood as a land-use case, not as an unjust enrichment case.  If that is right, then far from

---

"jurisdiction" --- that encompass disparate concepts that have historically been tucked in together under the same verbal formulation.  See United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 39 (1952) (Frankfurter, J., dissenting); Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 n.4 (2d Cir. 2001); Khalil v. Joyce, 777 F. Supp. 3d 369, 389 (D.N.J. 2025). "Unjust enrichment" may simply be one of those too-broad terms, that pulls in a range of ideas, some of which are not tightly linked to each other.

bearing <u>extra</u> weight in analysis of New Jersey unjust enrichment law, perhaps <u>Shazo</u> should bear none at all.

## 2.    **Products Liability**

As just discussed, foregrounding <u>Shazo</u> does not work as a way to break the stalemate, <u>see</u> Part II.A to Part. II.C, on the direct relationship question.

Try here a second approach.

For this approach, start by noting that there may be a close relationship between two questions.

On the one hand, the open legal question here --- whether a direct relationship is required to make out an unjust enrichment claim.

And on the other hand, a resolved legal question: whether "privity" is generally needed in the products liability area.

As to the <u>resolved</u> legal question, take some history first.

To make out a products liability claim, the old rule was that there needed to be buyer-seller privity.  <u>See</u> <u>Winterbottom</u> v. <u>Wright</u> (1842) 10 M. & W. 109, 114 (KB) ("Unless we confine the operation of such contracts as this to the parties who entered into them, the most absurd and outrageous consequences, to which I can see no limit, would ensue.").

But then the "citadel" of privity began to buckle and break. <u>See</u> <u>MacPherson</u> v. <u>Buick Motor Co.</u>, 217 N.Y. 382, 391-94 (1916); <u>Ultramares Corp.</u> v. <u>Touche</u>, 255 N.Y. 170, 180 (1931) ("The assault upon the citadel of privity is proceeding in these days apace."); William L. Prosser, <u>The Assault Upon the Citadel (Strict Liability to the Consumer)</u>, 69 Yale L.J. 1099, 1148 (1960) (same).

And when the dust settled, American courts had generally come to rest on the conclusion that when a product physically injures someone,[20] the injured person can sue the manufacturer --- even if she was not in privity with the manufacturer.  <u>See</u> <u>generally</u> William L. Prosser, <u>The Fall of the Citadel (Strict Liability to the Consumer)</u>, 50 Minn. L. Rev. 791 (1966).

---

[20]  Or some property other than itself.

But what of claims for purely economic losses?  Should plaintiff-defendant/consumer-manufacturer privity still be required when a product does not injure anyone[21] but nevertheless fails to meet a consumer's expectations?

This kicked off a debate that lasted for a number of generations.  See Sharkey, The Remains of the Citadel, 100 Minn. L. Rev. at 1865-69.

The New Jersey Supreme Court, writing in 1965, initially lead the school of thought that held that consumer-manufacturer privity was not required in economic losses cases.  See Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 60-63 (1965).

The opposite position was associated with California's Supreme Court, also writing in 1965.  See Seely, 63 Cal. 2d at 17-18.

Around two decades after the battle lines were first laid down, the United States Supreme Court, acting in a federal common law case, embraced California's position over New Jersey's.  See E. River S.S. Corp., 476 U.S. at 870-71.

From there, the New Jersey Supreme Court rethought.  In part because the Uniform Commercial Code had come on-line in the years after 1965, the New Jersey Supreme Court essentially determined that privity is indeed required in products liability suits alleging only economic losses.  See Alloway v. Gen. Marine Indus., 149 N.J. 620, 627-28 (1997).

At the end of all this, American law has mostly landed on roughly these rules:

- In products liability cases, if a product hurts someone, the consumer can sue the manufacturer even when they are not in privity.  See, e.g., Nobility Homes of Tex., Inc. v. Shivers, 557 S.W.2d 77, 81 (Tex. 1977); Rardin v. T & D Mach. Handling, Inc., 890 F.2d 24, 28-29 (7th Cir. 1989) (applying Illinois law); Potter v. Chi. Pneumatic Tool Co., 241 Conn. 199, 210, 214 (1997).
- But if the product does not hurt someone[22] --- if the basis of the consumer's claim is her dashed expectations, just a possible economic loss --- then the consumer can generally only sue in cases where she is in privity with the

---

[21]  Or any other property.

[22]  Or, as noted, some property other than itself.

manufacturer.  See, e.g., Ritter v. Custom Chemicides, Inc., 912 S.W.2d 128, 133 (Tenn. 1995); Duffin v. Idaho Crop Improvement Ass'n, 126 Idaho 1002, 1007 (1995); Hinrichs v. DOW Chem. Corp., 389 Wis. 2d 669, 686-87, 690-91 (2020).

This is a finely-balanced apple cart.

It rests on complex and likely inter-dependent policy choices made by state courts.  See Sharkey, The Remains of the Citadel, 100 Minn. L. Rev. at 1857-58, 1861-62.

And there is at least an argument that it could all be upended if unjust enrichment claims are allowed to go forward in cases like this one.

*    *    *

The just-referenced argument would go like this:

In products cases, allowing no-direct-relationship unjust enrichment claims to go forward would veer close to permitting what American law generally forbids --- an economic-loss-only products liability claim in the absence of privity.[23]

The careful structure that the law has built up as to where privity is not required (physical harm cases) and where it is required (economic loss cases) should not be too easily side-stepped --- by allowing an unjust enrichment claim, even though, in some respects, such a claim looks like a fairly close substitute for a disallowed economic-loss products liability claim.

To put the argument a bit differently:

The background rule is that economic-loss-only products liability claims cannot go forward unless there is privity.

But would that rule not be swallowed up if a similar claim (an unjust enrichment claim in an economic-loss-only products liability-type case) could go forward even without a direct relationship?

---

[23]  A key premise of this argument: that there is no large difference between (a) the privity requirement (in economic-loss-only products-liability cases) and (b) a direct relationship requirement (in economic-loss-only cases that involve a product, and where the claim is unjust enrichment).

When it comes to unjust enrichment, maybe it makes sense to require a direct relationship (in economic-loss-only products cases) with an eye to keeping intact the privity requirement (in economic-loss-only products liability cases).

\*    \*    \*

It is hard to say whether an argument along the lines set out above might be persuasive.

The reason why: fully assessing the argument turns on issues that are too knotty for a quick-and-clear answer.

For example, a key reason why privity is required in economic-loss-only products liability cases is to box in tort law, so as to leave behind some space for private-ordering via contracts (in the form of warranties running from manufacturers to others). See E. River S.S. Corp., 476 U.S. at 866 (expressing concern that "contract law would drown in a sea of tort"); Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, 880 (1997) ("courts should not ask tort law to perform a job that contract law might perform better"); Seely, 63 Cal. 2d at 15; Alloway, 149 N.J. at 627-29; Sharkey, The Remains of the Citadel, 100 Minn. L. Rev. at 1871-79.

But does that concern matter quite so much when it is not a tort claim that is being cabined, but rather an unjust enrichment claim? After all, an unjust enrichment claim is drawn from a mixed palette --- of tort elements, yes; but also of contract elements. See Edwin W. Patterson, The Scope of Restitution and Unjust Enrichment, 1 Mo. L. Rev. 223, 224-26 (1936); see also J.B. Ames, The History of Assumpsit I: Express Assumpsit, 2 Harv. L. Rev. 1, 15-16 (1888); William A. Keener, The Law of Quasi-Contracts 14-15 (1893); see generally Stephen A. Smith, Unjust Enrichment: Nearer to Tort than Contract, in Philosophical Foundations of the Law of Unjust Enrichment 181 (Robert Chambers, Charles Mitchell & James Penner eds., 2009).

And also: how might all this play out in the case of a product (like a home alarm system) that is generally professionally installed and used in a single way for a single purpose by all customers?

Part of why privity is required in economic-loss-only cases is that different products are used by different people in different ways. See, e.g., E. River S.S. Corp., 476 U.S. at 874. But does that concern apply to the alarms at issue here?

### 3.  **Werwinski**

Where things stand.

There is gridlock on this question: can an unjust enrichment claim go forward under New Jersey law without a direct relationship between a consumer-plaintiff and a defendant-manufacturer?  <u>See</u> Part II.A to Part II.C.

That standstill makes it especially hard to predict how the New Jersey Supreme Court would answer the question.

Two ways to cut the knot seem promising out of the gate, but do not ultimately work.

<u>First</u>, <u>Shazo</u> might be foregrounded in the prediction analysis, because it is newer.  But <u>Shazo</u> may well be distinguishable from cases like this one --- and indeed may not be best understood an unjust enrichment case at all.  <u>See</u> Part II.D.1.

<u>Second</u>, what about an analogy to the privity rule that applies to economic-loss-only products liability claims?  That might imply that a direct relationship may be required in this case.  But before getting to that conclusion, other questions would need asking.  And they are tough ones.  As to the core nature of unjust enrichment.  And as to how things might play out as to products like the professionally-installed alarms at issue here, products that seem to have only a fixed use.  <u>See</u> Part II.D.2.

                    *    *    *

In light of all this, look to another way to break the tie.  Unlike the other two, this one works.

In <u>Werwinski</u> v. <u>Ford Motor Co.</u>, the Third Circuit announced a principle to guide federal courts in their prediction of how a state supreme court might rule on an issue: "if we [a]re torn between two competing yet sensible interpretations of [the state's] law . . . we should opt for the interpretation that restricts liability, rather than expands it, until the [s]upreme [c]ourt of [that state] decides differently."  286 F.3d 661, 680 (3d Cir. 2002).

The court of appeals has since reaffirmed this principle.  <u>See</u> <u>Travelers Indem. Co.</u> v. <u>Dammann & Co.</u>, 594 F.3d 238, 253 & n.10 (3d Cir. 2010); <u>M.G. ex rel. KG</u> v. <u>A.I. Dupont Hosp. for Child.</u>, 393 F. App'x 884, 893 n.7 (3d Cir. 2010); <u>cf.</u> <u>City of Philadelphia</u> v. <u>Beretta U.S.A. Corp.</u>, 277 F.3d 415, 421 (3d Cir.

2002) ("[I]t is not the role of a federal court to expand state law in ways not foreshadowed by state precedent."); K.G. v. Owl City, 2025 WL 1577565, at *1 (3d Cir. June 4, 2025).

The Seventh Circuit has hewed to an identical doctrine. See, e.g., Pisciotta v. Old Nat. Bancorp, 499 F.3d 629, 635-36 (7th Cir. 2007); Harley-Davison Motor Co. v. PowerSports, Inc., 319 F.3d 973, 982 (7th Cir. 2003); Home Valu, Inc. v. Pep Boys, 213 F.3d 960, 965 (7th Cir. 2000); Birchler v. Gehl Co., 88 F.3d 518, 521 (7th Cir. 1996); Todd v. Societe Bic, S.A., 21 F.3d 1402, 1412 (7th Cir. 1994).

Other courts of appeals have gone in something of the same direction. See, e.g., Pearson v. John Hancock Mut. Life Ins. Co., 979 F.2d 254, 259 (1st Cir. 1992) ("A litigant who seeks out a federal forum when a state-court forum is equally available to him cannot justifiably complain if the federal court manifests great caution in blazing new state-law trails.");[24] Douglas Asphalt Co. v. QORE, Inc., 657 F.3d 1146, 1154 (11th Cir. 2011) ("It is not the function of federal courts

---

[24] Per the cited First Circuit decision, a plaintiff who chooses a federal forum for a state-law claim is in no position to express surprise if federal court interpretations of state law bend some at the margins --- favoring defendants in close cases by not opting for liability-expanding interpretations. See Pearson, 979 F.2d at 259. The point seems to be: Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), aims to prevent forum-shopping, see Hanna v. Plumer, 380 U.S. 460, 468 (1965), but if the plaintiff picked the federal forum, how can she "complain," Pearson, 979 F.2d at 259, if state law in the federal court is not interpreted to her liking? After all, the plaintiff was the one who did the "shopping." But does this account for a plaintiff who files in state court and then has his case removed to federal court? See, e.g., 28 U.S.C. § 1441. That plaintiff chose a state forum for his state-law case but then was moved to a federal forum --- where there is, at the edges, something of a pro-defendant approach to state law under the principle cited in the text. Would that sort of plaintiff have a more "justifiabl[e] complain[t]?" Pearson, 979 F.2d at 259. (And note: if the Erie law-prediction rules mean that state law will sometimes be more pro-plaintiff in state court and more pro-defendant in federal court --- would that systematically favor out-of-state defendants sued by locals in state court (who can easily remove to federal court), over in-state defendants sued by locals in state court (who cannot)?)

to expand state tort doctrine in novel directions absent state authority suggesting the propriety of doing so."); see also Ashley County v. Pfizer, Inc., 552 F.3d 659, 673 (8th Cir. 2009).

*    *    *

In this case, the legal authorities are evenly balanced. See Part II.A to Part II.C.

Some authorities suggest that for a New Jersey unjust enrichment claim, a direct relationship between a consumer-plaintiff and a manufacturer-defendant is needed.

Others suggest the opposite.

But it is the first approach that tends to expand liability. And so, consistent with Werwinski, the Court will not go that route.[25]

The Court holds that New Jersey law should not be understood to allow the Plaintiffs' unjust enrichment claim to go forward here, because the Plaintiffs allege no direct relationship with the Defendants.

---

[25] Werwinski, as noted, suggests that federal courts should chose the state-law interpretation that does not expand liability when making an Erie "prediction" as to state law. See Werwinski, 286 F.3d at 675. But one of Erie's core goals is to ensure that state-law cases come out roughly the same way in state court and in federal court. See Sun Oil Co. v. Wortman, 486 U.S. 717, 726-27 (1988). And in New Jersey state court, there is no Werwinski-like principle, no doctrine that judges should resolve close state-law questions in favor of not expanding liability. This might open up some federal-state daylight. A federal court, following Werwinski, could end up interpreting state law in a no-liability way. And that might be at odds with how a state court, not bound to add Werwinski's weight to one side of the balance scale, would decide. All of this implies that there is likely a hard limit on where and when the Werwinski principle can be applied. But where that outer bound is does not need to be addressed here (and neither does the issue in footnote 24). Werwinski announced the principle it did in a factual context that was unmistakably close to this one. See Werwinski, 286 F.3d at 663-64. How Werwinski might apply elsewhere is its own question. In this case, Werwinski clearly applies.

The unjust enrichment claim will be dismissed.

### III. **The Implied Warranty**

Move now to the Plaintiff's next claim, for breach of the implied warranty of merchantability.  <u>See</u> Complaint ¶¶ 147-53.

Can that claim work?

The answer runs through a 1987 law, the New Jersey Products Liability Act ("NJPLA"), N.J. Stat. Ann. § 2A:58C-1 <u>et</u> <u>seq</u>.

If a common law claim (like an implied warranty claim) is covered ("subsumed") by the NJPLA, the claim is cut off at the pass.  It cannot go forward.  <u>See</u> <u>Repola</u> v. <u>Morbark Indus.,</u> <u>Inc.</u>, 934 F.2d 483, 492 (3d Cir. 1991) (noting that the NJPLA "effectively creates an exclusive statutory cause of action for claims falling within its purview").

But if a common law claim is not covered by the NJPLA, it can proceed.

To decide whether a claim is subsumed, the Court must again look to the decisions of New Jersey's Supreme Court.  <u>See</u> <u>Spence</u>, 623 F.3d at 216.

But same issue as before: the New Jersey Supreme Court has not ruled on whether the NJPLA covers common-law breach of implied warranty claims, like the Plaintiffs' here.

Therefore, the Court must predict how the New Jersey Supreme Court would rule.

*      *      *

Before going forward, a brief detour.

In working through NJPLA subsumption issues, the New Jersey Supreme Court has suggested that courts should peek behind labels, to "the theory of liability underlying the claim."  <u>Sun</u> <u>Chemical Corp.</u> v. <u>Fike Corp.</u>, 243 N.J. 319 (2020).

An implied warranty of merchantability claim, as the Plaintiffs press, <u>see</u> Complaint ¶¶ 147-53, can foreground one of two sorts of "underlying" theories.

One theory mainly focuses on the back end of things --- merchantability.  The core of a claim along such lines: the product the plaintiff bought was defective, not fit for ordinary purposes.  This sort of implied warranty of <u>merchantability</u>

claim tends to look a bit more like a bread-and-butter tort claim.

Another sort of implied warranty of merchantability theory focuses to a greater extent on the front end --- on the <u>warranty</u> aspect of things.  It works more like a contract claim.  It emphasizes the shortfall between what was promised (warranted) and what was actually received.[26]

Here, the Plaintiffs' implied warranty of merchantability claim partakes of both sorts of theories.

On the tort/merchantability side of things, the Plaintiffs allege that the alarms the Defendants made simply did not work well enough.  <u>See</u> Complaint ¶¶ 150-53 (alleging that the alarms were "not fit for their ordinary/intended purpose of providing reliable life safety fire alarm protection").

And on the contract/warranty part of the ledger, the Plaintiffs allege that promises were made --- but the alarms did not live up to them.  <u>See id</u>. ¶¶ 149, 151 (alleging that the Defendants impliedly warranted that the alarms "complied with the applicable and mandated codes and standards").

\*    \*    \*

---

[26]  As to the distinct aspects of an implied warranty claim, the Supreme Court has noted that "the action upon the [implied] warranty may be either in contract or in tort."  <u>Dushane</u> v. <u>Benedict</u>, 120 U.S. 630, 636 (1887); <u>see also</u>, <u>e.g.</u>, <u>Ware</u> v. <u>Christenberry</u>, 637 P.2d 452, 456 (Kan. Ct. App. 1981) ("[A] person suffering damage from breach of an implied warranty may proceed upon either a contract or tort theory, or both, in initially framing his cause of action."); <u>O.M. ex rel. McConnell</u> v. <u>KLS Martin LP</u>, 560 F. Supp. 3d 1084, 1091 (N.D. Ohio 2021) ("An implied warranty claim may be brought on a tort-based theory or a contract-based theory.").  As to the shared contract/tort origins of the breach of warranty claim, see William L. Prosser, <u>The Implied Warranty of Merchantable Quality</u>, 27 Minn. L. Rev. 117, 118-22 (1943), and also Prosser, <u>The Assault Upon the Citadel</u>, 69 Yale L.J. at 1126-27.  Under the Uniform Commercial Code, the more tort-like aspects of the implied warranty are at Section 2-314(2)(a)-(d), while the more contract-like aspects are at Section 2-314(2)(e)-(f).  <u>See</u> U.C.C. § 2-314 (Unif. L. Comm'n 2022); <u>see also</u> N.J. Stat. Ann. § 12A:2-314.

Understood as mainly about alleged <u>merchantability</u> failures,[27] the Court predicts that the New Jersey Supreme Court would hold that the Plaintiffs' implied warranty claim is subsumed by the NJPLA and therefore cannot proceed.

That is the subject of this Part.[28]

**A.    <u>State Cases</u>**

Start with decisions from New Jersey's intermediate appellate courts.  <u>See</u> <u>Badalamenti</u>, 755 F. Supp. 3d at 540-41.

And all but end there, too.  Because more than 30 years' worth of state appellate decisions point in essentially the same direction: when a product-defect theory is emphasized, the NJPLA subsumes implied warranty claims, and therefore prevents them from getting off the ground.  <u>See</u>, <u>e.g.</u>, <u>Tirrell</u> v. <u>Navistar Int'l, Inc.</u>, 248 N.J. Super. 390, 398 (App. Div. 1991); <u>Green</u> v. <u>Gen. Motors Corp.</u>, 310 N.J. Super. 507, 517 (App. Div. 1998); <u>Cornett</u> v. <u>Johnson & Johnson</u>, 414 N.J. Super. 365, 404 (App. Div. 2010), <u>aff'd</u>, 211 N.J. 362 (2012); <u>Ford Motor Co.</u> v. <u>Mendola</u>, 427 N.J. Super. 226, 240 (App. Div. 2012); <u>Williams</u> v. <u>Clark</u>, 2024 WL 5245001, at *3 (N.J. Super. Ct. App. Div. Dec. 30, 2024).[29]

---

[27]  That is: understood mostly as a simple defect theory --- that the alarms just did not work well enough, separate from any representations that were made about them in their instructions. <u>See</u> Complaint ¶¶ 150-53.

[28]  Taken as foregrounding alleged <u>warranty</u> failures --- that is, that the alarms did not measure up to what was said about them, <u>see</u> Complaint ¶¶ 149, 151 --- the Plaintiffs' implied warranty claim may or may not be subsumed by the NJPLA.  But taken this way, the implied warranty claim fails on the merits, because it does not press a plausible, non-conclusory claim.  That is the subject of Part IV.

[29]  Each of the cases cited in the text was an implied warranty claim that leaned heavily on the alleged existence of a defect. <u>See</u> <u>Tirrell</u>, 248 N.J. Super. at 394 ("Plaintiff's theory of liability was that the manufacturer's failure to install a back-up signal created a design defect."); <u>Green</u>, 310 N.J. Super. at 514 ("Plaintiff's engineering expert's theory of the cause of plaintiff's injury focused on the collapse of the" car roof); <u>Cornett</u>, 414 N.J. Super. at 317 ("At issue [are] . . . claims for alleged defects in a medical device . . . ."); <u>Mendola</u>, 427

Consider <u>Tirrell</u> v. <u>Navistar International, Inc.</u>, 248 N.J. Super. 390 (App. Div. 1991), which came down a few years after the NJLPA passed.[30]

There, the plaintiff sued a flatbed manufacturer, alleging that not installing a back-up signal amounted to a defect. <u>See id</u>. at 394. The appellate court held that the plaintiff's implied warranty claim was subsumed by the NJPLA, which "no longer recognizes . . . breach of warranty (with the exception of an express warranty) as a viable separate claim." <u>Id</u>. at 398.

Thirty years later, intermediate appellate courts were going down the same road.

In <u>Cornett</u> v. <u>Johnson & Johnson</u>, 414 N.J. Super. 365 (App. Div. 2010), a state appellate court assessed an implied warranty claim pressed in connection with an allegedly defective medical device. <u>See id</u>. at 371. And the <u>Cornett</u> court reaffirmed that implied warranty claims of this sort are subsumed by the NJPLA. <u>See id</u>. at 404.

The decisions of lower state courts "can be a solid data point from which to predict how the highest state court will rule," especially where they "reflect a stable and long-term consensus as to what the state's law is." <u>See</u> <u>Howard</u>, 733 F. Supp. 3d at 356.

---

N.J. Super. at 238 (alleging that "a defective car was leased to her"); <u>Williams</u>, 2024 WL 5245001, at *2 ("The complaint asserts that the plaintiff sustained personal injuries arising from an allegedly defective product." (cleaned up)). Thus, these cases are more about merchantability (the more tort-like aspect of an implied warranty of merchantability claim) than about warranty (the more contract-like aspect).

[30] The New Jersey Supreme Court has noted that where "there is ambiguity in . . . statutory language," it may well make sense to look to the "contemporaneous construction" of the statute. <u>Kocanowski</u> v. <u>Township of Bridgewater</u>, 237 N.J. 3, 9 (2019) (cleaned up). This may mean that <u>Tirrell</u> should get some added weight in the balance, because it interpreted the NJLA only four years after that statute was passed. <u>Cf</u>. <u>Navigators</u>, 739 F. Supp. 3d at 268 (in predicting "how a state supreme court will rule on an open legal question," federal courts should "generally analyze the question using the same interpretative approach that the state supreme court applies").

And here, there is just that: a body of appellate jurisprudence that is consistent across several decades, and therefore offers an especially "solid," id., basis for state-supreme-court prediction.[31]

### B.  Sun Chemical

New Jersey intermediate appellate rulings, as just noted, are clarifying here.

Now look further up the chain.  In predicting how a state supreme court will eventually rule, the "reasoning" of state supreme court cases can be especially telling, even in the absence of an on-point supreme court holding.  See Schulman, 684 F. Supp. 3d at 282.

The reasoning of the main New Jersey Supreme Court decision in this area, Sun Chemical Corp. v. Fike Corp., 243 N.J. 319

---

[31]  On its own, the text of the NJPLA might be read to suggest that implied warranty claims are not covered by the statute. After all, the NJPLA only purports to displace common-law actions that seek "damages for harm caused by products," N.J. Stat. Ann. § 2A:58C-1(a) --- and the statute's definition of "[h]arm" might not be taken as reaching pure economic-loss claims like this one.  See id. § 2A:58C-1(b)(2).  But the New Jersey Supreme Court has indicated that the NJPLA aims to codify some of the state's case law.  See Sun Chem., 243 N.J. at 333; see also Dean v. Barrett Homes, Inc., 204 N.J. 286, 295 (2010). So the text of the statute does not stand alone.  Moreover, a hard look at the text of the NJPLA is not the only interpretive method that New Jersey appellate courts have used in working through the NJPLA.  See, e.g., Sun Chem., 243 N.J. at 333 & n.3 (looking to legislative history); Tirrell, 248 N.J. Super. at 398 n.5 (same).  And to accurately predict how a state supreme court will one day rule, the way forward is to use the interpretive methods of the state courts (reflected here in an unbroken chain of state-court decisions), not to focus on how a federal court, committed more exclusively to another approach (like textualism), might itself interpret a federal statute. See Navigators, 739 F. Supp. 3d at 268; Badalamenti, 755 F. Supp. 3d at 543; Schulman, 684 F. Supp. 3d at 279-81 & n.5; Abbe R. Gluck, Intersystemic Statutory Interpretation: Methodology As "Law" and the Erie Doctrine, 120 Yale L.J. 1898, 1929-30 (2011).

(2020), strongly supports the conclusion that an implied warranty claim, when (as here) it foregrounds a defect theory, is subsumed by the NJPLA.

Sun Chemical concerned the relationship between the NJPLA and another New Jersey statute, the Consumer Fraud Act ("CFA"), N.J. Stat. Ann. § 56:8-1, et seq.

In Sun Chemical, the New Jersey Supreme Court looked to the underlying "theory of liability" to see if a CFA claim was covered by the NJPLA.  See 243 N.J. at 339.

The key question: "whether the claim is based upon a product's manufacturing, warning, or design defect and therefore covered by the [NJ]PLA."  Id. at 338.

Here, that makes things straightforward.  The Plaintiffs' implied warranty claim is plainly "based" on the contention that the alarms in question had a defect.  See Complaint ¶¶ 150-53.

The New Jersey Supreme Court, the Court predicts, would thus hold that the Plaintiffs' implied warranty claim here is covered by the NJPLA and therefore cannot get off the ground.  It must be dismissed.[32]

---

[32]  This conclusion is not altered by federal court decisions interpreting New Jersey law, because those are divided --- split between cases that hold that implied warranty claims are subsumed, and those that come to the opposite conclusion. Compare Kaplan, 2023 WL 4288157, at *5 (breach of implied warranty claim subsumed); Elezovic v. Motor Coach Indus., Inc., 2022 WL 3316018, at *3 (D.N.J. Aug. 11, 2022) (same); Hindermyer v. B. Braun Medical Inc., 419 F. Supp. 3d 809, 820 (D.N.J. 2019) (same); Clements v. Sanofi-Aventis, U.S., Inc., 111 F. Supp. 3d. 586, 596-97 (D.N.J. 2015) (same); Calender v. NVR Inc., 548 F. App'x 761, 764 (3d Cir. 2013) (same); Fid. & Guar. Ins. Underwriters, Inc. v. Omega Flex, Inc., 936 F. Supp. 2d 441, 447 (D.N.J. 2013) (same); Arlandson v. Hartz Mountain Corp., 792 F. Supp. 2d 691, 702-04 (D.N.J. 2011) (same), with Volin v. Gen. Elec. Co., 189 F. Supp. 3d 411, 418 (D.N.J. 2016) (breach of implied warranty claim not subsumed); Kuzian v. Electrolux Home Prods., 937 F. Supp. 2d 599, 608 (D.N.J. 2013) (same); Montich v. Miele USA, Inc., 849 F. Supp. 2d 439, 455-58 (D.N.J. 2012) (same).  And note a key point: all of the cited federal court decisions that suggest an implied warranty claim is not subsumed pre-date the New Jersey Supreme Court's 2020 Sun Chemical opinion, which clarified the law in this area.

## IV.  **The Remaining Claims**

Turn now to the remaining five claims.

First, take up the three New Jersey common-law claims that, at their core, require a false representation of some sort from the Defendants.  See Part IV.A.

And then look to the Plaintiffs' two claims that allege violations of New Jersey statutes.  See Part IV.B.

### A.  **False Statement Claims**

The Plaintiffs press a set of common-law claims that turn in some way on alleged false statements by the Defendants: fraud, negligent misrepresentation, and breach of the express warranty. See Complaint ¶¶ 127-46.[33]

In its previous Opinion and Order in this case, see footnote 8, the Court predicted that the New Jersey Supreme Court would hold "that a company's statement that its product is third-party certified," by an entity like Underwriters Laboratories, Inc. ("UL"), "does not, without more, allow the company to be sued on a tort claim that rests on a false statement when the alleged false statement is that the third-party made the wrong decision in issuing its certification."  Badalamenti, 755 F. Supp. 3d at 547.[34]

But this "prediction as to New Jersey law r[an] only as far as it [needed to]," and "[did] not purport" to address other scenarios.  See id. at 547 n.16.

The Court identified two.

First, the Court noted, there might possibly be liability under one the cited theories if there was "improper collusion" between a manufacturer and third-party safety-certifier, or where "the manufacturer worked to actively deceive [the certifier] to procure a certification."  Id.

---

[33]  Plus the residual contract-flavored aspect of the implied warranty claim, discussed above in Part III.

[34]  To the extent the Plaintiffs' current complaint raises claims that should be dismissed under the reasoning of the Court's prior decision, the Court sticks to that reasoning here.

Second, there might possibly be liability where a manufacturer "did not believe that its product met the relevant [certifier's] standards --- but opted to submit the product anyway, in the hopes of a mistake squeaking through."  Id.

The Plaintiffs argue they have made out a claim under these two theories.  See Plaintiffs' Brief at 12.

But this is not persuasive, even assuming arguendo that these theories are generally viable when the right allegations are made.

\*     \*     \*

The Plaintiffs' main allegation in support of the two referenced theories is that the Defendants "were required to verify that their equipment was conforming."  Complaint ¶ 9.

This is apparently to suggest that the Defendants got their alarms UL-certified even though they knew the alarms were not fit for purpose.  How did the Defendants know?  Because, it seems, the alarms could not have been "verif[ied]" as "conforming," and a verification test was "required."  Id.

But the Plaintiffs say nothing more about any of this.  About who did the verification.  When it took place.[35]  How it was done.[36]  How the Defendants became aware of it.  Or about what made it "required."[37]

The Plaintiffs' allegation as to verification is, in short, conclusory.  And a "conclusory . . . pleading cannot survive a motion to dismiss."  Cuevas v. Wells Fargo Bank, N.A., 643 F. App'x 124, 126 (3d Cir. 2016); see also Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009) ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

And same point as to the Plaintiffs' allegation that the Defendants "concealed" alleged alarms defects while

---

[35]  Before the alarms went over to UL?

[36]  To the same standards as UL's?

[37]  That something was allegedly "required" does not generally count, without more, as a plausible allegation that the thing was done.  Cf. Jones v. Dokos Enters., Inc., 233 Va. 555, 557 (1987) ("[T]he fact that Jones was required to do an act is not proof that he did the act.").

"affirmatively representing the high quality and safety" of their products.  Complaint ¶ 15.

This stands alone.  And standing alone, it is also too little to go on.

There are no allegations as to who did the "conceal[ing]," or when or how.  Or what "affirmative[] represent[ations]" were made to UL, and by whom --- and how they were allegedly false and known to be false.

The Plaintiffs' allegations are little more than a repackaging of the legal standard that, for present purposes, the Court assumes arguendo is governing here.

A bare allegation that facts were concealed from UL is no different than simply saying the Defendants tried to let a "mistake squeak[] through," Badalamenti, 755 F. Supp. 3d at 547 n.16, the UL certification process.

And that, on an assuming-arguendo basis, is part of the legal standard here.  But "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555; cf. Drucker Cornell v. Assicurazioni Generali S.p.A. Consol., 2000 WL 284222, at *2 (S.D.N.Y. Mar. 16, 2000) ("legal conclusions done up as factual allegations are not facts and cannot substitute for facts").[38]

---

[38] Two additional notes.  First, the Plaintiffs try to move the needle by alleging that the Defendants "knew or should have known" of the alleged alarms defect.  Complaint ¶¶ 13, 84, 91, 95; see also id. ¶¶ 62, 107 (the Defendants "knew or were required to know" of the alleged defect); id. ¶¶ 81, 89 ("pretests would have shown" the defect); id. ¶¶ 83, 86, 90, 93 ("Had [the Defendants] regularly tested," they "would have confirmed" the defect); id. ¶ 98 ("[the] Defendants knew about the Alarm System Defect but continued selling the Alarm Systems").  But as the Court previously observed, "[t]he Plaintiff's should-have-known allegation[s] are plainly [] too generic to survive." Badalamenti, 755 F. Supp. 3d at 547 n.16. Second, the Complaint also alleges that the instructions that came with the alarms falsely purported to comply with a certain fire protection standard.  See Complaint ¶¶ 25-26, 34-36, 53-60, 65.  But this, too, rests all but entirely on "should-have-known allegation[s], Badalamenti, 755 F. Supp. 3d at 547 n.16, about

41

*    *    *

The Plaintiff's common-law negligent misrepresentation, fraud, and express warranty claims must be dismissed.[39]

They did not clear the plausibility bar before.  See Badalamenti, 755 F. Supp. 3d at 547-48.

And to the extent additional legal theories may potentially work in general, see id. at 547 n.16, the allegations pressed here in support of them are too conclusory to pass muster.

### B.    **Statutory Claims**

Look finally to the Plaintiffs' two claims that allege violations of New Jersey statutes --- the Consumer Fraud Act, see Complaint ¶¶ 114-26, and the Truth in Consumer Contract, Warranty, and Notice Act ("TCCWNA").  See id. ¶¶ 161-69.

The first element of the Consumer Fraud Act claim, "unlawful conduct by [the] defendant," piggybacks on the allegations at the core of the misstatement claims discussed in Part IV.A.  See Badalamenti, 755 F. Supp. 3d at 548.

But those are insufficient to state a claim, see Part IV.A, and so the CFA claim must be dismissed, too.[40]

The Plaintiffs also allege a violation of the TCCWNA.  But their TCCWNA claim is rooted in an alleged violation of the Consumer Fraud Act.  See Complaint ¶ 166.

"That the [CFA] claim cannot go forward means that the TCCWNA claim cannot either."  Badalamenti, 755 F. Supp. 3d at 549.

---

pre-testing of alarms.  See Complaint ¶¶ 80-95.  These do not add up to a plausible claim.

[39]  And so, too, the implied warranty claim, understood as rooted in a false statement-type theory and to the extent it survives the NJPLA.  See generally Part III.

[40]  The Plaintiffs allege that the Defendants failed to comply with the New Jersey International Residential Code 2015, thereby violating the CFA.  See Complaint ¶¶ 17, 125.  But a regulatory violation "in and of itself is not actionable under the CFA."  See Francis E. Parker Mem'l Home, Inc. v. Georgia-Pacific LLC, 945 F. Supp. 2d 543, 564 (D.N.J. 2013) (emphasis omitted).  And that is all that is alleged here.

The TCCWNA claim is therefore dismissed.

## V.    Conclusion

For the reasons set forth above, the Defendants' motion to dismiss is granted.[41]

IT IS on this 28th day of October, 2025, **SO ORDERED.**

_____
Michael E. Farbiarz, U.S.D.J.

---

[41] The Plaintiffs shall file a very brief letter on or before November 6 indicating whether they will aim to file a new complaint. If they do not wish to file a new complaint, the Court will promptly enter judgment for the Defendants. If the Plaintiffs do wish to file a new complaint, the Court will set a tight briefing schedule as to whether today's motion-to-dismiss grant should be deemed entered with or without prejudice.